MARATHON INTERNATIONAL PE-TROLEUM SUPPLY CO., Plaintiff,

v.

I.T.I. SHIPPING, S.A., in personam, M/T RUTH M., her engines, tackle, apparel, etc., in rem, and Saybolt De Mexico, S.A., in personam, Defendants.

No. 87 Civ. 3762 (RWS).

United States District Court, S.D. New York.

June 10, 1991.

As Amended July 24, 1991.

---

Haight, Gardner, Poor & Havens, New York City, for plaintiff; Ronald J. Kennedy, Paul E. O'Brien, of counsel.

Walker & Corsa, New York City, for defendant I.T.I. Shipping, S.A.; Leroy S. Corsa, Kirk M.H. Lyons, of counsel.

Stark Amron Liner & Narotsky, New York City, for defendant Saybolt de Mexico, S.A.; Howard C. Amron, Michael A. Gould, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Marathon International Petroleum Supply Company ("MIPSCO") initiated this maritime action against defendants I.T.I. Shipping, S.A. ("ITI"), its vessel, the M/T RUTH M, and Saybolt De Mexico, S.A. ("Saybolt") for damages resulting from the presence of water in a shipment of oil from Rabon Grande, Mexico to the Louisiana Offshore Oil Port ("LOOP"). A bench trial was held on January 14 and 15, 1991 and final arguments were heard on March 7. Upon all the proceedings and the following findings of fact and conclusions of law, the complaint will be dismissed.

*Prior Proceedings*

On January 16, 1990 the motion of a third party defendant Petroleos Mexicanos ("Pemex") to dismiss the third party complaint against it filed by ITI was granted, and the third party complaint was dismissed for lack of jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). On June 27, 1990 a memorandum opinion was filed denying the motion of ITI for reargument and to dismiss the complaint on the grounds of the absence of an indispensable party. 740 F.Supp. 984. Familiarity with those opinions is assumed.

*The Facts*

On July 1, 1981 MIPSCO and Pemex entered into a contract of sale for crude oil to be supplied by Pemex and to be carried aboard vessels nominated by MIPSCO (the "Contract"). The Contract also provided that title and risk of loss was to pass to MIPSCO at the time the crude oil passed the flange connection between Pemex's delivery hose and the vessel's cargo intake apparatus and further provided that "any loss of or damage to the oil during loading that is caused through fault of the vessel shall be for [MIPSCO's] account."

Article 9 of the Contract was titled "Verification and Measurement of Crude Oil and Products" and provided that the quality and quantity of crude oil was to be determined by sampling, testings and measurement conducted by an independent inspector appointed by both parties and by its certificate setting forth the quantity and quality of crude oil. The data contained in this certificate was to be binding and conclusive upon both Pemex and MIPSCO. The costs of such independent inspection were to be shared equally between Pemex and MIPSCO, and that the verification and measurement of crude oil delivered was to be conducted in accordance with the methods approved and accepted by the American Society for Testing and Materials ("ASTM") or the American Petroleum Institute ("API"). MIPSCO is a wholly owned subsidiary of Marathon Petroleum Company ("Marathon"). Under the Contract, MIPSCO lifted cargoes approximately twice a month from Mexico.

On June 11, 1980, Pemex had promulgated a regulation requiring all surveyors of crude oil cargoes to complete their sampling of the cargo at least two hours prior to the completion of loading of crude oil into any vessel. At a meeting in 1985, a Saybolt employee at Rabon Grande advised MIPSCO representatives of the restrictions concerning surveyors at Rabon Grande. From 1980 to 1986 MIPSCO lifted over 100 cargoes at Rabon Grande, including ten tanks of Maya crude oil.

On May 20, 1986, Hancock Shipping Company Ltd. ("Hancock"), another subsidiary of Marathon entered into a charterparty with ITI which owned the motor tanker RUTH M. In exchange for freight, the RUTH M was to carry a minimum of 125,000 long tons of crude oil from the east coast of Mexico to the United States Gulf. On or about May 20, 1986 MIPSCO nominated the RUTH M to transport two parcels of crude oil which would be supplied by Pemex. Pursuant to the contract, MIPSCO purchased 595,693 barrels of Maya crude oil.

The quantity and quality of crude oil under the Contract was to be determined by an independent inspector appointed jointly by MIPSCO and Pemex in accordance with the methods approved and accepted by the ASTM.

Cargoes of crude oil typically contain a quantity of water, which is deducted from the overall volume of cargo, to arrive at the net quantity of crude oil delivered. The water in cargoes of crude oil exists either as "free water," *i.e.,* water which has precipitated out of the crude oil and is readily identifiable as water separate from the oil, or as "base sediment and water" ("BS & W"), *i.e.,* emulsified water which is dispersed as a colloidal suspension within the oil. To determine the quantity of BS & W in the oil, a representative sample of the cargo must be taken by a petroleum inspector and subjected to laboratory analysis. The amount of water in suspension is then represented as a percentage of the overall volume of the cargo and deducted therefrom, together with the amount of free water, to determine the net quantity of crude oil delivered. With respect to the determination as to the presence of free water in the tanks, settling of tanks takes one hour before an accurate determination can be made.

On May 20, 1986, Saybolt was selected by MIPSCO and Pemex as the independent inspector to determine the quality and quantity of 595,693 barrels of Maya crude oil purchased under the Contract. On May 21, 1986, the RUTH M received orders from ITI's agent in New York, Maritime Overseas Corporation. These instructions directed the master of the RUTH M to

provide information regarding the cargo of crude oil to MIPSCO or its representatives after loading. Among the information requested to be provided was the volume of oil loaded as recorded on the bills of lading, the free water observed in the RUTH M's tanks after loading had been completed, the sediment and water content of the cargo, and letters of protest, discrepancies, or comments noted by the crew of the RUTH M, if any.

On May 27, 1986 the RUTH M arrived at Rabon Grande, Mexico. As the RUTH M loaded, Saybolt's inspector, accompanied by the chief officer or other members of the crew of the RUTH M, took intermittent samples of crude oil from the cargo tanks. These samples were taken ashore and analyzed to determine quality and quantity. No samples were taken of the crude oil loaded in tanks 1C and 4C. The ship's chief officer, Sang Jae Lee, did not protest Saybolt's failure to take samples.

During or immediately after the Maya crude oil was pumped aboard, the chief officer and the Saybolt inspector, as they gauged (as opposed to sampling) tanks 1C and 4C discovered large amounts of free water in these two tanks, to wit, 1126 barrels in tank 1 center and 68 barrels in tank 4 center. The chief officer had never observed water in crude oil to such an extent and believed that water was separating from the crude oil. Neither Saybolt nor the ship undertook any further measures to discover the extent of the free water contamination or to advise MIPSCO's local agent of their findings at the time.

Saybolt performed an analysis of samples taken from the Maya crude oil and Isthmus crude oil loaded aboard the RUTH M in Mexico. With respect to the Isthmus crude oil, this analysis yielded a BS & W content of 0.15% and a water by distillation content of 0.25%. With respect to the Maya crude oil, the analysis by Saybolt yielded a BS & W content of 0.05% and a water distillation content of 0.10%.

A vessel gauging report for the RUTH M was issued by Saybolt on May 29, 1986. This report noted, *inter alia,* that 1126 barrels of free water were present in cargo tank 1 center and 68 barrels of free water were present in cargo tank 4 center of the RUTH M. Cargo tanks 1 center and 4 center were the last two cargo tanks of the RUTH M to be loaded in Mexico on May 29, 1986.

After loading the two cargoes of crude oil in Rabon Grande, the RUTH M issued two bills of lading. These bills of lading incorporated the charterparty of May 20, 1986. This charterparty, by clause 32, incorporated the Hague/Visby Rules, a regime governing the duties and liabilities of parties to a bill of lading. Article 3 of the Hague/Visby Rules, requires the carrier that issues a bill of lading to exercise due diligence to make the ship seaworthy, to man the ship properly, and to load, handle, carry, stow, keep, care for and discharge the cargo carefully.

The master of the RUTH M issued a letter of protest at Rabon Grande, stating that 1285 of water were loaded in the Maya crude and 483 barrels of water in the Isthmus crude, a protest which was given to the loading terminal and to MIPSCO agent. On May 30 the RUTH M telexed MIPSCO advising that water had been loaded, in error transposing the figures for the two types of crude.

On May 30, 1986, MIPSCO informed Marathon Marine, a subsidiary of Marathon, by telex that there were 142 barrels of free flowing water in the Maya crude oil loaded aboard the RUTH M and that the sediment and water content of the Maya crude oil was 0.05%. Saybolt also advised that the Isthmus crude oil loaded aboard the RUTH M contained 483 barrels of free flowing water and that the sediment and water content of the Isthmus crude oil was 0.15%. These calculations were in error.

The RUTH M, sailed upon completion of the loading on May 29 and departed Rabon Grande at 0100 hours on May 30, 1986. The vessel arrived at the LOOP on June 2, 1986.

Upon arrival of the RUTH M at LOOP on June 1, E.W. Saybolt & Co., Inc. ("E.W. Saybolt"), an affiliate of Saybolt, analyzed a sample of Maya crude oil which was identified as a "vessel composite" and also

prepared its own sample for analysis. The "vessel composite" analysis yielded a water by distillation content of 0.15% and a water and sediment content of 0.05%. E.W. Saybolt's sample yielded a water by distillation content of 2.5% and a water and sediment content of 2.4%.

E.W. Saybolt issued a letter of protest to the RUTH M at LOOP. This letter protested an increase in free water "measured under cargo onboard at discharge port compared with load port measurements . . ." of 12,696 barrels and further noted that the RUTH M loaded 596,350 barrels of crude oil and discharged 583,699.67 barrels for an in transit difference of 12,650.33 barrels, or 2.12% of the crude oil cargo carried aboard the RUTH M, the difference being free water. At $8.80 a barrel this represented a loss of $110,924 attributable to the free water taken on board at Rabon Grande. The loading and testing and the absence of any intervening events or conditions establish that the water was contained in the untested liquid placed on board by Pemex just prior to the sailing of the RUTH M.

The Maya crude discharged from the RUTH M was pumped from the LOOP to the Clovelly Salt Domes, with other similar crudes, or directly to Marathon's refinery at Garyville, Louisiana, depending on the processing requirements. The quantity of Maya crude oil from the shipment in question received by Marathon's refinery is not known, but it can be inferred that 595,693 barrels of Maya crude oil that Marathon purchased from MIPSCO under the MIPSCO invoice of June 5, 1986 were in fact received. No evidence shows otherwise.

On May 30, 1986, Pemex issued Invoice No. 20805 to MIPSCO in the amount of $9,111,763.00 for 299,974 barrels of Isthmus crude oil with a price of $12.90 a barrel and 595,693 barrels of Maya crude oil with a price of $8.80 a barrel.

Earlier in May excessive free water was found by Marathon to have entered a shipment of oil lifted from Mexico by the GARYVILLE for Marathon.

On June 5, 1986 MIPSCO issued Invoice No. CO–512 to Marathon in the amount of $9,111,763.00 for 299,974 barrels of Isthmus crude oil and 595,693 barrels of Isthmus crude oil. Sometime after June 24, 1986 MIPSCO paid Pemex the invoice amount for the oil.

This action was instituted in 1987 by MIPSCO, an action ratified by affidavit of April 25, 1989 submitted by a vice president of its parent Marathon submitted in the course of this proceeding.

*Conclusions of Law*

MIPSCO Has Failed to Prove Damages

■ By its June 5, 1986 invoice MIPSCO charged Marathon for the sale of 595,693 barrels of Maya crude oil at the price of $8.80 per barrel and was paid. Since the same quantity of Maya crude oil purchased by MIPSCO from Pemex was sold by MIPSCO to Marathon at the same price per barrel, no monetary loss was thereby sustained. *Thyssen Steel Caribbean, Inc. v. Palma Armadora S.A., et al.,* 1984 AMC 1133, 1137 and 1138, 1983 WL 674 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1441 (2d Cir.1984); *see, B.F. McKernin & Co., Inc. v. United States Lines, Inc.,* 416 F.Supp. 1068 (S.D. N.Y.1976).

Further, no assignment or other tangible evidence of transfer to MIPSCO of any loss of Marathon was made.

By as early as June 6, 1986, MIPSCO knew that approximately 14,000 barrels of water were found aboard the RUTH M at the discharge port. The Contract required payment within thirty days after the bill of lading date, or by June 29, 1986. Notwithstanding its knowledge of the existence of about 14,000 barrels of water, MIPSCO chose to pay Pemex.

■ Further, the contract of carriage for the crude oil in question was the charterparty dated May 20, 1986, between ITI and Hancock Shipping, another subsidiary of Marathon, as charterer. One of the consequences of the charterparty being the contract of carriage is that the bill of lading issued for the Maya crude oil was not issued as a document of title evidencing a contract of carriage, but rather as a receipt evidencing only that Maya crude oil was loaded aboard the RUTH M. *Vanol U.S.A.*

v. *M/T CORONADO,* 663 F.Supp. 79 (S.D. N.Y.1988); 2A *Benedict's on Admiralty,* §§ 33–34.

█ No evidence was presented by MIPSCO which shows that the bill of lading was negotiated to Marathon or some other entity as a holder in due course. Since MIPSCO was not a party to the contract of carriage, MIPSCO's cause of action against ITI may only sound in tort. *EAC Timberland v. Pisces, Ltd.,* 745 F.2d 715 (1st Cir. 1984).

### MIPSCO Has Standing to Sue on Behalf of Marathon

MIPSCO maintains that it has standing to sue on behalf of Marathon under three theories—that of a consignee on the bill of lading; an agent for Marathon; and as a subsidiary of Marathon.

█ MIPSCO can initiate an admiralty action in its own name, subject to the ratification of its principal, based from the following language from *The North Carolina,* 40 U.S. (15 Pet.) 40, 49, 10 L.Ed. 653 (1841):

> ... and we consider it as well settled, in admiralty proceedings, that the agent of absent owners may libel, either in his own name, as agent, or in the name of his principals, as he thinks best; that the power of attorney, subsequent to the libel, is a sufficient ratification of what he had before done in their behalf ...

The *North Carolina* was relied upon as the statement of the traditional position by the Second Circuit Court of Appeals in *Aunt Jemima Mills Co. v. Lloyd Royal Belge,* 34 F.2d 120, 121 (2d Cir.1929). *See also National Safe Corp. v. Texidor Security Equipment,* 101 F.R.D. 467, 469 (D.P.R.1984) (the "mere" ratification by the principal will cure any objection brought that the plaintiff has no standing); *Escriptorio Suplicy, Inc. v. Companhia De Navegacao Maritima Netumar,* 1978 A.M.C. 138, 140 (S.D.N.Y.1977) (shipping agent proper plaintiff); *Socomet, Inc. v. S/S SLIEDRECHT,* 1975 A.M.C. 314, 317 (S.D. N.Y.1975) (subsidiary entitled to be plaintiff, as court found the parent [owner of cargo] had ratified the suit).

█ Further, since MIPSCO is a wholly-owned subsidiary of Marathon, initiation of suit by MIPSCO on its parent's behalf was proper. In *Unilever (Raw Materials) Ltd. v. M/T STOLT BOEL,* 77 F.R.D. 384, 389 (S.D.N.Y.1977), the initial lawsuit was initiated by the shipper, which was a subsidiary, and an amended complaint was filed substituting the parent. The court found this was a proper substitution and noted that its decision was based on longstanding admiralty precedent which recognized the "persistent difficulty in maritime cargo shipment cases of naming the real party in interest." *See Unilever, supra,* 77 F.R.D. at 389.

MIPSCO may rely on this admiralty precedent to maintain this suit on behalf of Marathon but, of course, the right to sue does not obviate the need to establish the elements of a cause of action on behalf of Marathon.

### Marathon Has Failed to Prove Damages

Marathon did not own or have title to the Maya crude oil until after the crude oil was discharged from the RUTH M at the discharge port. On June 3, 1986 the Maya crude oil was discharged at the LOOP. By invoice dated June 5, 1986, Marathon purchased the same quantity of Maya crude oil at the same price as MIPSCO had purchased from Pemex. Marathon did not purchase the bill of lading.

█ The purchaser of cargo, following discharge of the discharge port, has no cause of action against the carrier. *Firestone Plantations Co., et al. v. Pan Atlantic S.S. Corp.,* 77 F.Supp. 401 (S.D.N.Y. 1948). In *Firestone,* the parent corporation of the shipper sought to intervene as a party plaintiff. The action was dismissed for failure of the parent corporation to prove a loss. The cargo in question was purchased from the shipper by a non-party while the cargo was aboard the vessel at the loadport. The parent corporation/purchaser then bought the cargo from the non-party after the cargo was discharged from the vessel at the discharge port. The

price paid by the parent corporation/purchaser was the same as paid by the non-party to the shipper. In holding that the parent corporation/purchaser sustained no loss as against the carrier, the court stated:

> Here, [the non-party] paid in the first instance for the rubber while it was afloat, and by invoices all dated December 15, 1942, over 30 days after delivery to the dock in New York, it sold to the [parent corporation/purchaser] not by transfer of the bills of lading or by creating any special property therein, but by independent transaction. If any cargo loss was sustained, it was by the cargo owner, but none was proved, since the sale was for the same price that [the non-party] had paid.

*Id.* at 402.

> The fact that the [parent corporation/purchaser] might have become assignee of the bills of lading, or made advances against them, cannot obscure the fact that it did neither; the fact that it could have acquired title to the cargo of crude rubber while it was yet afloat onboard the Pan Crescent, does not mean that its rights as intervenor are the same as though it had; the circumstances that it acquired title ex-dock means that it bought rubber on the dock, as it then was, not that it acquired rights which by some indefinite process could be related back to an earlier time.
>
> It results that the intervening libels must be dismissed for failure of proof.

*Id.* at 403.

■ By as early as June 6, 1986, Marathon knew the extent of the water contained in the cargo purchased from MIPSCO. When MIPSCO tendered a non-conforming product, Marathon had an option to: (a) reject all of the Maya crude oil and water; (b) accept all of the Maya crude oil and water; or (c) accept any commercial unit of the Maya crude oil and water. U.C.C. § 2–601. Further, Marathon had the right to deduct from the price due under the contract with MIPSCO all or any part of the damages resulting from MIPSCO's nonconforming tender. U.C.C. § 2–717. By failing to avail itself of its legal rights under the Uniform Commercial Code, Marathon waived its contract claims.

The facts establish that MIPSCO paid Pemex after learning of the presence of water in the cargo and that in turn with the same knowledge Marathon paid MIPSCO. There is, therefore, no proof of damage suffered by Marathon presented in this proceeding, other than the existence of the water at the time of unloading at the LOOP. Indeed, under the facts presented here it would be difficult, perhaps impossible, to establish just what was received by Marathon from the Salt Dome or at the Garyville refinery. Someone may well have been short 1,285 barrels of oil, but this record does not establish that it was Marathon.

### ITI Did Not Violate Any Obligation to MIPSCO

The breach of duty claimed by MIPSCO rests solely on the failure of the BS & W analysis to be representative of the Maya crude oil loaded aboard the RUTH M because tanks nos. 1 center and 4 center were not sampled.

The Hancock Shipping/Marathon Cargo Accountability for Marine Transport (CAMT) pamphlet requires, *inter alia:*

D. *After Loading*
1. On ship.

    \*    \*    \*    \*    \*    \*

c. Cargo tanks.

    \*    \*    \*    \*    \*    \*

(4) Sampling and analysis.—A *Minimum* of one half of the tanks for each crude oil grade of the loaded cargo should be sampled according to recognized standards. Sample all tanks if four or less tanks contain a single grade.

Ten tanks aboard the RUTH M were loaded with Maya crude oil. At least seven of those crude oil tanks were actually sampled by Saybolt.

However, masters of crude oil tankers do have a duty to ensure that independent inspectors follow proper sampling procedures during the course of the loading of crude oil according to documents from Hancock which were not produced at trial.

Nonetheless, maritime arbitration awards dealing with this issue have routinely recognized the independent status of inspecting companies such as Saybolt. For example, in *In the Matter of Arbitration between Clarendon Marketing Inc. and Toro Energy USA, Inc.*, SMA 2680 (1990), p. 13, it was found:

Saybolt was selected as the independent inspector and it was Saybolt's responsibility to insure that the sampling was performed in a fair and independent manner. It has been argued that Saybolt's witnessing the drawing of samples by an interested third party satisfies the depth of its responsibility but that is, indeed, questionable at best. Assuming for a moment that the mere witnessing of such a procedure is sufficient, and we do not believe it is, the independent inspector cannot sit on his hands and allow others to perform his task in any manner they see fit. This is particularly true where the independent inspector knows or has reason to know that the method of sampling employed by the third party may not yield an accurate result. Such is not an independent determination in any sense of the word.

■ The only instructions to notify MIPSCO concerning Saybolt's sampling techniques were the charterparty and voyage instructions sent to the vessel. Neither of those documents, however, contained any instructions to ITI Shipping or the vessel to advise MIPSCO if MIPSCO's independent inspector improperly sampled the cargo tanks.

The only relevant information requested by MIPSCO in the voyage instructions were for the vessel to advise MIPSCO on the quantity of free water loaded aboard the vessel, the S & W content of the oil, and whether any notice of protest was issued. The RUTH M complied with these instructions, and this information was telexed from the RUTH M to MIPSCO on May 30, 1986.

■ The letter of protest issued by the master at the load port stated that 1,285 barrels of water were loaded in the Maya crude oil and 483 barrels of water in the

Isthmus crude oil. The vessel's telex of May 30, 1986, however, transposed these numbers. The Master's letter of protest for water was given to the loading terminal and MIPSCO's agent at the loadport, and there has been no showing that MIPSCO relied on the RUTH M telex particularly in light of the Saybolt report at the LOOP. The transposition did not constitute a breach of duty. No other obligation of ITI has been established.

**Any Negligence on the Part of Saybolt Does Not Give Rise to Liability**

■ Saybolt took samples of crude oil before loading was completed which did not properly represent the composition of all the cargo in the tanks. Proper sampling techniques had not been followed for this cargo as a consequence of the port regulations in force. Saybolt fits within the general category of parties who have been held liable for misrepresentation under such circumstances: marine cargo surveyors regarding certificates of satisfactory stowage, *Royal Embassy of Saudi Arabia v. S.S. Ioannis Martinos*, 1986 A.M.C. 769, 785–89 (E.D.N.C.1984), *SS AMAZONIA v. New Jersey Export Marine Carpenters*, 564 F.2d 5 (2d Cir.1977); marine surveyors regarding weight certificates, *Plata American Trading, Inc. v. Lancashire*, 1958 A.M.C. 2329, 2235–37 (N.Y.App.Div.1958); an engineer regarding a report on the condition of a building, *Robert & Co. Assoc. v. Rhodes–Haverty Partnership*, 250 Ga. 680, 300 S.E.2d 503 (1983); land surveyors, *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969); public weighers regarding weight certificates, *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922); and abstractors of property records, *Lovaleski v. Tallahassee Title Co.*, 363 So.2d 1156 (Fla.App.1978), *Williams v. Polgar*, 43 Mich.App. 95, 204 N.W.2d 57 *aff'd*, 391 Mich. 6, 215 N.W.2d 149 (1974).

However, as set forth above, neither MIPSCO nor Marathon has established any damage arising out of the breach of duty. Moreover, under the regulations in effect at Rabon Grande, promulgated by Pemex, Saybolt was obliged to test cargo at least

two hours before completion of loading. Since the proof established that water was introduced into the cargo at the load port at the end of the loading procedure, after the cargo had been tested, Saybolt was unable to detect the water.

At the time MIPSCO paid for the cargo it was fully aware of the extent of free water found at the LOOP. Despite such knowledge, it paid Pemex in full for the cargo. Beyond an initial inquiry, it prosecuted no claim against Pemex for the water included in the cargo, notwithstanding the provisions of the contract between Pemex and MIPSCO particularly permitting claims for shortages to be made within sixty days after delivery of the vessel at the port of loading. MIPSCO thereby waived its right against Pemex by failing to make the claim within the sixty day period.

MIPSCO could also have availed itself of the rights afforded it by the Uniform Commercial Code to deduct from the purchase price a sum representing the amount of water present. The proximate cause of its loss was not any act of Saybolt. The loss was caused by MIPSCO voluntarily making payment when it was not required to do so, or in having made payment, voluntarily relinquishing its right to recover for merchandise not received.

*Conclusion*

Based upon the findings and conclusions set forth above, judgment will be entered on notice dismissing the complaint of MIPSCO with costs. All Rule 11 F.R.Civ.P. applications are denied, the foregoing discussion having established that the positions taken by the parties have been taken in good faith and after adequate consideration of the facts and the authorities.

It is so ordered.