**TEXPORT OIL COMPANY, Plaintiff,**

v.

**M/V AMOLYNTOS, its engines, boilers, tackle, etc., et ano., Defendants.**

No. CV 90–1658(ADS).

United States District Court, E.D. New York.

March 24, 1993.

---

Walsche, Sheinbaum & O'Regan, P.C., New York City, for plaintiff; John R. Foster, of counsel.

Cichanowicz, Callan & Keane, New York City, for defendants; James M. Textor, of counsel.

## MEMORANDUM AND DECISION

SPATT, District Judge.

### Background

In April 1990, the Texport Oil Company ("the plaintiff" or "Texport") purchased more than 500,000 barrels of Romanian gasoline. The seller was a Swiss company, BULK OIL A.G. ("Bulk Oil") which arranged for the transportation of the gasoline aboard the defendant vessel, the M/V Amolyntos ("the defendant" or "the Amolyntos"). The basis for this lawsuit is the claim by the plaintiff that when the gasoline aboard the Amolyntos arrived in New York Harbor, some of it was darker in color than when loaded aboard ship in Romania. The plaintiff contends that this darkened gasoline required additional treatment and expense and rendered it less marketable, to its damage.

### Stipulated Facts

The plaintiff Texport is an oil and gasoline trading company located in Houston, Texas. Texport does not own or operate gasoline stations and is not an end user of gasoline. Instead, it buys, blends and sells gasoline and other products to major oil companies, other trading companies or to end users. In 1990, for purposes of gasoline storage and blending, Texport leased shore tanks in two separate terminals in New Jersey, the GATX facility in Carteret and the Stolt facility in Perth Amboy.

The defendant vessel, the M/V Amolyntos, is an ore/bulk/oiler type tanker, sometimes referred to as an "OBO." This is significant since the vessel carries bulk products in addition to liquid cargo. The Amolyntos has nine cargo tanks, numbered one to nine from forward to aft. The cargo is loaded and discharged through the portside duct keel, which is a tunnel space running below the cargo tanks. The portside duct keel can also hold cargo and in this case held some of the gasoline at issue. The Amolyntos flies the Maltese flag, has submitted to *in rem* jurisdiction and provided security of $2,037,392.44 in lieu of the maritime arrest of the vessel.

On or about April 24, 1990, Bulk Oil, as seller, and Texport, as buyer, entered into a sales contract for 60,000 MT of "Rumanian

Unleaded Gasoline." Texport purchased this gasoline to be used as a blending component to make merchantable gasoline for resale to end users or traders in the Port of New York. The sales contract listed specifications for the gasoline. The maximum Reid Vapor Pressure ("RVP") (an evaporation point test) was 9.0 and the minimum octane of the cargo was to be 85.0. For May and June 1990 in the Port of New York, the maximum RVP content for merchantable gasoline was 9.0 based on local environmental regulations, and the minimum octane content was 87. To upgrade the gasoline to the required RVP and octane, blending was required.

The Amolyntos arrived at Constanza, Romania on April 14, 1990. Its prior cargo had been a shipment of coal to Taranto, Italy. The nature of the prior cargo is an important factor because of the plaintiff's contention that the coal contributed to the darkened color of the gasoline when it arrived in New York.

The Master of the vessel signed the Bill of Lading acknowledging receipt for 549,685 barrels of unleaded gasoline. In addition to various documents, the Master signed for and received six sealed samples of the cargo for delivery to the consignee and the surveyors at the port of destination. The six sealed samples were comprised of two average samples from the Romanian shore tanks, two average samples from the pipeline from the shore tanks to the ship's connection, and two average samples from the vessel's tanks after loading. Texport paid Bulk Oil for the cargo, and the Bill of Lading was endorsed to it.

The Amolyntos departed from Constanza on April 20, 1990 with New York as its destination. The ocean voyage was uneventful and the ship arrived in the Port of New York on May 10, 1990. Shortly after the ship's arrival and clearance by customs officials, surveyors representing various interests boarded the Amolyntos to gauge and sample the cargo, including Caleb Brett U.S.A. Inc., an independent public survey company ("Caleb Brett"), the seller Bulk Oil and the vessel.

On May 10, 1990, the attending surveyors conducted cargo gauging and sampling activities. During this operation, samples of all nine cargo tanks and the port duct keel were obtained and placed in glass bottles. In addition, the ship delivered all the Constanza samples to Caleb Brett.

By reason of the fact that several tank samples were darker than those obtained from other cargo tanks, Texport ordered Caleb Brett to re-sample three tanks, namely, tanks five, eight and nine. On May 10, 1990 at 6:00 p.m. and on May 11, 1990 at 6:30 a.m., Caleb Brett "pulled" two sets of samples from cargo tanks five, eight and nine for the purpose of re-analyzing these tanks, which contained gasoline having a darker color than the other six cargo tanks.

On May 10, 1990 or May 11, 1990, Texport notified the cargo insurers in London regarding a potential cargo contamination on the Amolyntos. Texport ordered the vessel not to start unloading the ship until the insurance representative reached the Amolyntos. On May 12, 1990, John Allen, representing the cargo insurers in London, arrived at the ship.

The cargo at issue was fully discharged at the Stapleton Anchorage using five barges in eight movements from May 15 to May 20, 1990. Texport personnel in Houston issued oral discharge instructions to the ship's personnel. The cargo from the various tanks on the Amolyntos was commingled on the barges, which then discharged the gasoline to the terminal shore tanks. The cargo was discharged by the barges to one shore tank at the Stolt Terminal at Outerbridge, near Perth Amboy, New Jersey, and to nine shore tanks at the GATX Terminal in Carteret, New Jersey. At the time, Texport leased shore tanks at both terminals.

The Amolyntos delivered 545,503.65 barrels of cargo, stored as follows:

| Cargo Tanks | Quantity | |
|---|---|---|
| 1 | 44,646.60 | barrels |
| 2 | 80,456.28 | " |
| 3 | 46,645.62 | " |
| 4 | 79,201.40 | " |
| 5 | 42,544.75 | " |
| 6 | 80,199.05 | " |
| 7 | 46,936.00 | " |
| 8 | 78,285.50 | " |
| 9 | 43,442,51 | " |
| Port Duct Keel | 3,145.94 | " |
| TOTAL | 545,503.65 | barrels |

There is no claim by Texport for cargo shortage.

Caleb Brett maintains a laboratory in Linden, New Jersey, and employs a staff of lab technicians for the purpose of making various analytical tests on petroleum cargoes. The cargo samples are obtained from the ship by the Caleb Brett field inspector, who delivers the cargo samples to the laboratory in Linden.

The color of the gasoline was determined according to an ASTM (American Society for Testing and Materials) color scale. The figure 0.5 represents a water white color; and as the sample gets darker, the data is reported in progressions of 0.5 to a maximum figure of 8. Hence, 1.5 is darker than 1.0, which in turn is darker than 0.5. Values may also be expressed as falling between two figures, *e.g.*, "lighter than 2.0." The symbol "$<$" means "lighter than." The margin of error on this test is 0.5.

On May 10, 1990, the Caleb Brett lab technicians ran a series of analytical tests on the cargo samples taken from the Amolyntos in New York that day. The test results were, in pertinent part, as follows:

| Cargo Tank | RVP | Color |
|---|---|---|
| 1 | 9.2 | No Data |
| 2 | 9.4 | No Data |
| 3 | 9.3 | No Data |
| 4 | 9.6 | No Data |
| 5 | 9.3 | 4.5 Dark/Light Brown |
| 6 | 9.5 | No Data |
| 7 | 9.5 | No Data |
| 8 | 9.6 | 1.5 Dark Amber |
| 9 | 9.6 | 4.5 Dark Brown |

On May 20, 1990, the surveyors and John Allen pulled a full set of ship samples for reanalysis. The samples were taken from the top, middle, and bottom of each ship tank. Between May 25 and May 31, 1990 a joint laboratory analysis of all samples was conducted at the Caleb Brett laboratory in the presence of representatives from all interested parties. With the exception of some tests regarding color analyses, all the analytical tests were conducted by Caleb Brett and witnessed by the attending representatives.

For the color of the samples from the terminal and the vessel at Constanza, Romania, the joint lab analysis reached the following results:

| Cargo Tank | Color |
|---|---|
| 1 | $<1.0$ |
| 2 | 1.0 |
| 3 | $<1.0$ |
| 4 | $<1.0$ |
| 5 | $<1.0$ |
| 6 | $<1.0$ |
| 7 | $<1.0$ |
| 8 | 1.0 |
| 9 | $<1.0$ |
| Port Duct | 1.0 |
| Shore Tank Average | 1.0 |
| Headline Average | $<1.0$ |
| Ship Composite | 1.0, $<1.5$ |

($<$ means "lighter than").

For the color and RVP content from the vessel's cargo tanks at anchorage in New York, the joint lab analysis reached the following results:

| Cargo Tank | Color |
|---|---|
| 1 | $<1.0$, 1.0 |
| 2 | $<1.5$ |
| 3 | $<1.0$ |
| 4 | $<1.0$, 1.0 |
| 5 | 3.5, $<4.0$ |
| 6 | $<1.0$ |
| 7 | $<1.0$ |
| 8 | 1.5, $<2.0$ |
| 9 | 4.0 |
| Port Duct | $<4.0$ |

The color analysis of a composite sample of all the vessel's tanks by the various representatives, was as follows:

| Name | Company | Color |
|---|---|---|
| Jules Balogh | Caleb Brett | $<2.0$, $<2.0$ |
| Cliff LoBello | Caleb Brett | $<2.0$, 1.5 |
| John Allen | The cargo insurance company | $<1.5$, $<1.5$ |
| Carl Gryte | Representing the ship's interest | $<1.5$, $<1.5$ |

Following delivery by the vessel in New York, the cargo was blended on the discharging barges, as well as in the GATX and Stolt shore tanks. The gasoline was then sold by Texport to third parties as merchantable gasoline. There were no complaints about off-color gasoline. The gasoline was sold by Texport at market price with no discounts.

In accordance with the Bulk Oil/Texport sales contract, Bulk Oil obtained cargo insurance in the London market for the benefit of Texport. An insurance claim was submitted by Texport to these cargo insurers. After negotiations with the London insurers, in February 1991, Texport settled its insurance claim for $650,000. The insurers also assigned their subrogation rights against the AMOLYNTOS to Texport and the insurers have no claim against the vessel.

### The Contentions

The plaintiff Texport claims that it purchased and paid for the gasoline cargo which was loaded aboard the Amolyntos as a light yellow/straw colored product. However, at the time of delivery at the Port in New York, a portion of the cargo had significantly darkened in color. Texport contends that this color change in the gasoline while on board the Amolyntos diminished the market value of the gasoline and Texport was compelled to blend the gasoline to restore its original light yellow gasoline color.

As a result, Texport asserts that it sustained two types of damages. First, it contends that there was a "loss in market value" of the cargo in the total sum of $1,742,437.30. This measure of damage is based upon the testimony of Saul Quinn, an expert in the trading of gasoline in the New York Harbor area. Second, Texport contends that it sustained additional incidental expenses caused by the dark color condition, including extra laboratory expenses, extra equipment expenses, cancellation fees on equipment, extra demurrage expenses, extra terminal expenses, extra spill taxes, cover costs and extra finance costs, in the total sum of $416,169.86.

On the other hand, the defendant contends that there is no precise ASTM color specification for unfinished gasoline; there was no color specification listed in the contract and the visual color of the composite sample is "yellow," and acceptable. In addition, the defendant maintains that the cargo had a pre-shipment condition due to high RVP and low octane which required blending, in any event.

While Texport and Caleb Brett report that there was a darkened color in the gasoline in tanks five, eight and nine, and the duct keel, the defendant points out that cargo in the other tanks 1, 2, 3, 4, 6 and 7 had no color problem. It is the defendant's contention that the composite color of this cargo was 1.5, which is close to the Romania load port composite of 1.0 or lighter than 1.5. Further, says the defendant, since Texport intended to dilute the whole cargo to correct the RVP problem and to raise the octane level to the minimum of 87, the color of the three tanks involved was not a compensable problem.

As to damages, the defendant contends that the gasoline was used for its intended purpose; it was sold to third parties without any discount; it had to be blended for a different reason; Texport did not incur any extraordinary blending costs; and Texport ordered the ship's personnel to mix yellow and dark cargo and thus contributed to its own damages.

With regard to the plaintiff's claim of "loss of market value," the defendant contends that Texport delivered the gasoline at issue to third parties in satisfaction of contracts. There were no complaints as to color by the third parties and Texport did not discount any of the gasoline cargo. Thus, the defendant reasons that there could not be any compensable damage for "loss of market value."

Finally, the defendant contends that Texport's carrier paid it $650,000 for its alleged cargo contamination claim and waived its subrogation rights. The defendant asserts that this payment by the carrier should be credited against any recovery by Texport in this litigation.

## The Trial

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (*see also Colonial Exchange Ltd. Partnership v. Continental Casualty*, 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

## The Plaintiff's Case

■ SAUL QUINN is an expert in the trading of gasoline in New York Harbor. He stated the important specifications relating to marketable gasoline in New York Harbor in May of 1990. Included in those specifications is Reid Vapor Pressure ("RVP"), a test to determine how much of the product will evaporate and at what temperature. In the summer it is better to have a low RVP "so as not to experience vapor lock on the Long Island Expressway."

Quinn also discussed the "octane" and "color" features. Octane is a number "used to identify how even the fuel ignites and burns, giving (the vehicle) more of an efficient driveability. The higher the octane, the better the performance of the engine; the lower the octane, the less performance. To protect the American public, the Government requires certain levels. (The) minimum in the New York area is 87." Since the octane of the Romanian gasoline was 85, it would have to be "blended up" to make it marketable. "That's how people like Texport is (sic) in business ..." (Tr. at p. 51).

Color is graded by certain ASTM categories and "should be less than one." The higher the ASTM classification, the darker the gasoline. Questioned about a four color gasoline, Quinn testified that it is "very dark" and "would not be accepted by any terminal because it might contaminate ... other product ... in the terminal." The Court finds that dark-colored gasoline was not acceptable and marketable in the New York Harbor area in May 1990.

The color of gasoline is determined visually. The cargo is inspected by an independent testing lab. Samples are taken and the gasoline is tested for color against an ASTM chart. The ASTM color scale is numbered 0.5 to 8.0 by increments of 0.5, and the sample is compared against a known standard color. Concededly the categorization of color, based on a visual examination by each person viewing the gasoline, is subjective to some extent. Generally speaking, "yellow" is the preferred and acceptable color. Yellow is classified between 0.5 and less than 2.0 on the ASTM standard.

New York is a major trading area for gasoline. The price of gasoline is set by supply and demand and the gasoline marketed in New York is very competitive. According to Quinn, in May, 1990, there was a "tremendous" demand for gasoline.

As to discolored product, the market would demand a discount, even if there was nothing wrong with the gasoline. As of May 10, 1980, Quinn estimated that the discount for the discolored gasoline at issue would have been 1.7 million dollars, which is the sole basis for Texport's claim of "loss in market value" in that sum. This portion of Quinn's testimony is of interest:

"THE COURT: I lost you there.

Do you have an opinion with reasonable gas blending certainty as to what the market price of this discolored product was?

Is that what you asked?

MR. FOSTER: Yes, your Honor.

. . . .

THE COURT: When you say 1.7 million you say the cost is 1.7 million to make this gas saleable?

THE WITNESS: In the market on May 10th, because in that calculation I calculated a backwardation in the market. Because you would not be able to use the product right away. You could only use it after you blend.

So, including the backwardation, including the blending, the storage and the financing was approximately 1.7 million dollars. I don't have my notes in front of me, but that's from memory" (Tr. at pp. 24, 25).

Quinn then proceeded to go through the figures in detail with regard to the various expenses required to blend the product so as to improve its dark color. With regard to

the blending, Quinn testified that even though the gasoline would have had to be blended to reduce the RVP and increase the octane in any event, the color blending would be different:

"Q How would the blending for octane or RVP differ for blending—from blending for color?

A Theoretically you need not blend the product into storage if you are only blending for RVP or octane. You could blend it right on the barge. For example you could put some high quality, and we will use that word to define a higher octane or a lower RVP material on the barge and put your product on top of it. And while it is in transit it will mix up, and by the time it arrives to your customer's terminal, it is on spec material.

Blending for color because of the quantity and vast ratio you have to do you have to get it in the blender and blend it with a more formalized action with agitated mixers or stirrers, or what the industry refers to as jet blowers in the tank circulating the tanks giving it the kind of mixing one would envision in the kitchen" (Tr. at p. 33).

Significantly, as to the measure of damages for "loss of market value," the plaintiff's counsel conceded on the record that the plaintiff did not lose any money in the sale of the gasoline to third parties (Tr. at p. 38).

On cross-examination, Quinn explained that the minimum octane accepted in New York was 87. The Romanian product sold to the plaintiff was an "85 octane and have (sic) to be blended up" to at least an 87 octane. As stated above, Texport is a company that engages in blending and the upgrading of the octane can be easily arranged and accomplished by such a company.

In the contract between Bulk Oil as seller and Texport as buyer, the octane was listed as 85 but no color was specified. Since the octane was 85, Texport knew that the gasoline had to be blended, as apparently is required for all Romanian gasoline. In fact, one aspect of the plaintiff's business is to buy cargo at 85 octane and blend it up to grade, and in so doing, necessarily incur blending expenses.

The blending can be done on the barge while in transit or at a terminal in a tank. The gasoline at issue was to be discharged by the barges at the GATX Terminal in Carteret, New Jersey and at the Stolt Terminal in Perth Amboy, New Jersey. The Court finds that barge and terminal expenses would have been incurred by Texport even if there had been no color problem.

Quinn confirmed that after blending the gasoline removed from the Amolyntos, Texport received the standard market price for the product. There was no discount given to the purchasers because of the alleged color problem. Given the fact that the gasoline was sold at the prevailing market price, Quinn's testimony as to the "market value damages" of the discolored product was informative, but purely hypothetical. The Court finds that the plaintiff incurred no damage with regard to the market value of the gasoline at issue. As already stated, the plaintiff's attorney conceded that there was no reduction in the market price.

As to the RVP problem, when the gasoline reached New York, Caleb Brett reported that it was between 9.1 and 9.6, with a composite of 9.468 in eight tanks. This 9.4 RVP presented a problem in New York since gasoline was not marketable if over 9.0. In order to sell this gasoline, Texport had to blend the product with low RVP gasoline. Color aside, Texport still had to blend to reduce the RVP and to increase the octane. These expenses would have been incurred without any consideration of color, and cannot constitute damages to be paid by the defendant, even if liability is made out based on the change in color while in transit. Despite his testimony as an expert, Quinn had no knowledge of the actual blending expense required to correct the color, reduce the RVP, or increase the octane, although he stated that blending for color takes a much longer time than the other two types of blending.

According to Quinn, only tanks two, five, eight, nine and the duct keel had dark-colored gasoline. The color of the product in the other five tanks was acceptable. One of the plaintiff's damage problems is that even

without a color problem the gasoline had to be blended as to RVP and octane, in any event. A question to be resolved is the amount of expense incurred by the plaintiff by the additional blending incurred solely because of the dark color.

The Court declines to credit the testimony of Quinn with regard to the alleged diminution in market value of the cargo as it arrived in New York. The Court does not accept the purely hypothetical and theoretical opinion as to loss of market value. In fact, the gasoline was sold at the market price without discount and may very well have been advantageously increased in volume by the addition of the additive raffinate, as will be later discussed.

WILLIAM MONTGOMERY EUBANK, as a principal of Montgomery Eubank Corp., is one of the four general partners in the Texport Oil Company. He is involved in the plaintiff's trading and blending. Texport is the largest blender in the New York area.

Among the factors involved in the pricing of gasoline are octane, RVP and color. Eubank described the desirable color as "clear and bright, and usually straw, a very light straw type color or a light yellow." He stated that the color should have an ASTM number between .5 and 1, or there would be serious consequences, as follows:

"Q And if a product had an ASTM color greater than 1, what reaction would you have as a gasoline trader to that number:
A I would ask what is wrong with the product.
Q Would you have any particular concerns with the color or—why wouldn't you—
A It is not what is typically seen in gasoline or what would be expected. So I would be concerned with whether the gasoline is stable, whether there was a gum problem, what was the makeup of the gasoline, or whether there was some contamination on board" (Tr. at pp. 113, 114).

Under the contract with Bulk Oil, the seller was responsible for transporting the gasoline, even though the buyer took title at the load port in Romania. The total sale price for the gasoline sold by Bulk Oil and transported in the Amolyntos was approximately $12,500,000.00 which was paid by the plaintiff.

In the usual blending process, the plaintiff was to blend by adding 40,000 to 50,000 barrels of toluene, which would raise the octane to 87 and lower the RVP to 9.0. According to Eubank this blending process would take only one to a few days at their New York and New Jersey Terminals.

Eubank first learned of a problem with the cargo when a representative of Caleb Brett called and advised Texport that the RVP was higher than what was reported at the load port. When they retested the entire ship's cargo, Caleb Brett reported that some of the gasoline was "extremely dark, in fact black." As to the cause of the dark color, the tests proved inconclusive. The plaintiff never ascertained the reason some parts of the gasoline turned dark. The tanks which contained gasoline with a darker color are two, five, eight and nine comprising 29.1% of the total cargo.

The darkened gasoline was loaded into barges and taken to the GATX Terminal. The blending was started in the barges and continued at the GATX tanks. At the GATX tanks leased by Texport, the Amolyntos gasoline was mixed with other Texport gasoline transported into New York at that time by other ships. It was a long blending process that took three or four weeks and extended into June. In the shore tanks the dark gasoline was blended with "good" gasoline. Texport bought additional "good" gasoline to blend with the dark product. In addition, between 50,000 and 55,000 barrels of raffinate were purchased and used to blend. Eubank testified that the RVP and octane blend would only take a few days while the color blend took a month.

On cross-examination, Eubank was asked directly to set forth the basis of his damage claim against the vessel. In a confusing and contradictory manner, Eubank answered, as follows:

"Q Mr. Eubank, can you explain, sir, the basis of your damage claim against the vessel?
THE COURT: Now that's a good question.

MR. TEXTOR: Thank you, you Honor.

THE COURT: I would like to hear that also.

MR. TEXTOR: We are going to get to the root of the claim.

THE COURT: Let's get to the jugular right now.

A It is based on the damage, the goods received are not what we originally loaded and it had a damaged market value.

Q Sir, did you incur any out-of-pocket damages associated with the cargo on board the Amolyntos?

A Increased terminal expenses, unable to meet commitments that had previously been committed to with the Amolyntos, the two major components.

Q Sir, what is the amount associated with the increased terminal expenses?

A Somewhere around a million and a half dollars, I believe.

. . . . .

Q Are you making a claim against the vessel for a million and a half dollars for increased terminal expenses?

A I believe the claim is something like two million dollars.

. . . . .

Q Are you, Texport, making any claim against the vessel for an alleged diminution in the value of the cargo?

A Explain diminution for me, please.

THE COURT: Reduction.

A Yes, that's the basis of the claim.

Q And what is that claim, sir?

A That's the two million dollars.

. . . . .

Q You stated you have a claim against the vessel for two million dollars which is an alleged devaluation claim; is that correct?

A Correct.

Q And within that claim there is an increased terminal expense of about 1.5 million; is that correct?

A It is contemplated within that number, yes.

Q If you take out the alleged increased terminal expenses, what was the net claim that remains?

A The difference between a million and a half and two million is roughly five and a half million dollars—$500,000 I am sorry.

Q Is it fair to say, sir, that the alleged devaluation claim is approximately half a million dollars excluding any alleged terminal expenses?

A Yes.

. . . . .

Q And what is your total claim against the ship?

A We are not making the claim for the terminal cost.

. . . . .

Q The question I am asking you is: What is the approximate quantum of cargo that you are alleging with the associated devaluation claim?

A I believe it is something in excess of 200,000 barrels that looked darker than 1.

Q So, it is not for the whole vessel?

A No" (Tr. at pp. 154 to 158).

On redirect examination, Eubank again changed the posture of Texport's damage claims, as follows:

"Q Mr. Eubank, what is your understanding as to the total amount of Texport's claim in the lawsuit?

A I believe from the documents we just went over a few minutes ago, 2.2 million.

Q And what are the elements of that total amount as you understand them?

A About a million seven of reduced value for the cargo being off color. An additional $500,000 of incidental expenses.

Q What other damages did Texport have because of this dark cargo?

A Opportunity costs, various blending exercises and time, consumption—time consumption, and loss opportunity.

Q How are those items covered by the 2.2 million dollars that you mentioned before?

A It is contemplated in the reduced value portion, the 1.7 million.

Q What did it cost Texport to actually blend this dark gasoline?

A I do not know that information specifically (Tr. at pp. 251, 252).

Specifically asked to identify the blending expenses necessitated by the color problem, Eubank could not supply this information:

"Q Sir, you have given testimony that Texport engaged in blending to correct the alleged color to the cargo; is that correct?

A Yes.

. . . .

Q That's not my question. What is the exact quantum associated with you blending expenses?

THE COURT: You are talking about blending for the color?

MR. TEXTOR: For the color, sir.

A I can't identify those specifically.

Q But you are the person at Texport that was in charge of blending or correcting the color problem; is that correct?

A That's correct.

. . . . .

Q But you don't know what those actual blending expenses were, do you?

A For actually completing the blend of the Amolyntos, no. It is much too complex to exactly quantity—quantify" (Tr. at pp. 163, 169).

To lighten the color of the gasoline, Texport added raffinate which is a white clear naphtha product. The raffinate was blended with the gasoline and lost its identity. However, the total volume of the newly-blended gasoline increased by the addition of the raffinate. Texport purchased 50,000 to 55,000 barrels of raffinate consisting of 2,253,844 gallons at 43½¢ per gallon. Bloated by the raffinate, the gasoline eventually was sold at approximately 60¢ per gallon.

Eubank's office instructed Caleb Brett to inspect and test the gasoline in tanks five, eight and nine for "washed gums" and "oxidation stability" which could be causes of color contamination. The results of these tests were "inconclusive".

An important document, namely the first Texport "Laboratory Analysis Order" (Defendant's Exh. KK), surfaced during the cross-examination of Eubank. The report was undated. It listed the color as "yellow". Further, Eubank testified that this report concerned a vessel "composite" sample drawn from all the individual tanks, mixed together. Eubank further conceded that yellow is a good color for this product.

As to the alleged incidental expenses incurred in blending the dark gasoline, Eubank had no knowledge of these details. He stated that Martha Garrison, the Texport Director of Finance and Chief Financial Officer, assembled the claims data and has personal knowledge of the details of the claimed incidental expenses. However, Eubank did concede that expenses for "surveying cargo" a part of the attendance fees, blending expenses to reduce the RVP and some part of the lightening (barge) expenses, were normal operating expenses not involved in rectifying the color problem. He further conceded that of the Caleb Brett bills totaling approximately $32,000, not one bill was earmarked as related to the "color" tests. In addition, Eubank conceded that $18,000 of the expenses for barges would have been incurred even without any color problem.

JULES BALOGH is the laboratory manager for Caleb Brett. He would be concerned about a color level over the ASTM 1 classification. Caleb Brett could not "accept" gasoline in color greater than 1 because there is "generally a contamination and something causing that color to be darker" (Tr. at p. 263). In their testing of the Amolyntos cargo, no such contamination was found.

Balogh conceded that the ASTM testing process was not a scientific test but rather was based on a subjective standard, in that two persons could reasonably determine the color differently. He further conceded that whatever caused the gasoline to be darker in color, there was no contamination problem discerned by the Caleb Brett testing, and the Court so finds.

Balogh first learned of a color problem when the sample was brought to the lab and "there appeared to be some discoloration in a

few of the departments" (Tr. at p. 266). Caleb Brett then proceeded to resample and retest the cargo at the end of May, 1990 and in August, 1990, in the presence of representatives for all the interests involved. In the initial testing conducted on May 10, 1990, upon the arrival of the Amolyntos in New York, tanks five, eight and nine contained the gasoline with the suspected color problem. In the August, 1990 tests of sample taken from the GATX tanks, some of the gasoline was reported as lighter than 2.5, 2.0 and 1.5.

A maze of documents was introduced concerning color. Some were contradictory. With regard to the May 10, 1990 tests, the product was "perceived ... not to be discolored" (Tr. at p. 330). Based on a visual inspection, the cargo was satisfactory. However, the color was described as 2.5, which is dark. The Texport gasoline on barge Ocean Sixty was reported as yellow in color. There were also reports of all tanks other than the duct keel as 1.5 and the duct keel as 4.0. However, the duct keel load held only 1000 barrels of the 550,000 barrels transported.

The plaintiff's chief damage witness was MARTHA GARRISON, the Texport Director of Finance. Ms. Garrison testified that the color problem on the Amolyntos cargo of gasoline caused Texport to incur damages consisting of additional or incidental expenses. These damages included: additional spill tax charges (Plaintiff's Exh. 26); transportation of raffinate for use in blending for color (Plaintiff's Exh. 22); demurrage (extra vessel rental caused by delay) invoices for lighteners (Plaintiff's Exhs. 22, 25 and 26); lightening barges (Plaintiff's Exhs. 21, etc.); Chase Manhattan Bank letter of credit charges (Plaintiff's Exh. 28); interest on late payment (Plaintiff's Exh. 16); and additional borrowing costs because of delay.

Ms. Garrison supervised the insurance claim against Lloyds. In doing so, she tried to calculate Texport's actual blending costs. This was, in her words, "just a very futile exercise" (Tr. at p. 382). Significantly, she presented the insurance claim on a "hypothetical blending basis" (Tr. at p. 378) because Texport could not prove the actual additional blending costs, as she clearly stated in the following testimony:

"Q Mr. Quinn testified about the drop in market value because of the cargo's discoloration.

Did you use that type of analysis or approach on the insurance claim that was submitted to the London insurers?

A No.

Q Why not?

A Insurance policies dictate the only way that claims can be filed. It is boiler plate in the policy itself. And there are only two bases for our claim.

One is salvage value. And you can only claim under the insurance, if you actually sell the cargo in a damaged condition for salvage.

Texport didn't do that. *The only other way you can file a claim is in theory you have to prove your actual cost.*

*Well, Texport did a lot of work trying to identify the actual cost and couldn't.* So we presented the claim on a hypothetical blending basis. And the insurance company reviewed it on that basis.

Q Who did that analysis that came up with this hypothetical blend cost?

A I did.

Q And why did you do it that particular way as opposed to the actual blend cost?

A *Well, I tried to identify the actual blend cost and was unable to.*

. . . .

It got to be a very subjective and meaningless exercise.

. . . .

Other things made the exercise too subjective to have any real value.

. . . .

*In short, it was just a very futile exercise that many man hours were devoted to "* (emphasis supplied) (Tr. at pp. 377–382).

The Court finds that the plaintiff failed to establish the cost of blending the darkened gasoline so as to lighten it sufficiently to sell the product at market value.

On cross-examination, Ms. Garrison was closely questioned as to the plaintiff's damage claims. She stated that the plaintiff's claim arose under two theories, first for diminution of market value in the sum of $1.7 million, and second in incidental expenses of approximately $500,000. The diminution of market value is based on the testimony of Saul Quinn. Ms. Garrison again conceded that Texport could not "identify the exact blend costs" and could not produce any documents in that regard (Tr. at p. 400).

Even if the Court were to accept a "hypothetical blending cost," without documentation, this theory is fatally flawed in that it includes the cost of blending to reduce the RVP, a cost which would have been incurred regardless of the color problem, and which cannot be attributable to the defendant.

The Court finds that, even without any color problem, Texport would have had to pay approximately $500,000 to blend the gasoline so as to reduce the RVP and increase the octane, as follows:

"Q So, had the cargo come to New York as octane 85, with an RVP of eight, in other words, there is nothing wrong with this cargo, what would you have expected to spend in order to create finished gasoline?

A $500,000" (Tr. at p. 416).

To add to the lack of clarity with regard to Texport's claim of damages, as of June 1991, the plaintiff altered its damage theory. The plaintiff changed from a cost of blending to a diminution of market value claim, as the following testimony of Ms. Garrison reveals:

"Q As of June, 1991, ma'am, isn't it true that plaintiffs had changed the calculation of their damages against the vessel? Not the amount, but the theory.

A Yes. We now knew what the basis of the law for this type of case was.

. . . .

Q Based on those figures and the figures in that presentation, is there a claim for blending?

A *At this point the case had been changed to a diminution of market value which we believe to be the appropriate*

*damage in this kind of a case when you cannot identify your actual costs.*

Q All right.

So, the blending claim of 1.2 or 1.3 million that had originally been presented to Bulk and also the defendants, in the fall or summer of 1990 has now been deleted?

A Changed to the appropriate legal basis. We developed the original number—

Q Would you please give me an answer to the question.

A Yes" (emphasis supplied) (Tr. at pp. 425, 426).

As stated above, the claim for loss of market value is based solely on broker Quinn's evaluation, which the Court declines to credit.

Queried about the insurance company settlement, Ms. Garrison testified that Texport made a demand for $1.7 million and settled for $650,000. She does not know how the sum of $650,000 was computed. Again the point was vividly brought home that the plaintiff could not prove the blending or other costs required to rectify the color problem:

"Q Isn't it true, ma'am, that the $650,000 represents a settlement of an alleged contamination for color for tanks five, eight, nine and the port duct keel?

A It was not the way the claim was presented at all. We based it on saying that the whole cargo was self-blended with itself to achieve a lighter than two color. And our hypothetical blending model took the color down to a merchantable color.

You have to understand that if you cannot identify your actual cost, nor did you sell for salvage you are very much in the realm of a negotiated settlement. That's what this was" (Tr. at p. 434).

Ms. Garrison testified as to additional incidental expenses, as follows:

1. *Laboratory Expenses*—reduced from $31,974 to $24,807.19 (see Foster letter, Plaintiff's Exh. 40).

2. *Extraordinary Demurrage Expenses*—based on the necessity to use four

additional barges as well as the delay caused by the color problem. *$156,341*

3. *Extra Terminal Expenses*—increased from $105,399 to $155,137.41 (see Plaintiff's Exh. 40) in that Texport had to buy additional product totalling 372,000 barrels, to use either in the color dilution or to replace existing inventory that was used for that purpose. The 372,000 barrels at 28.3 cents per barrel totals approximately $105,000. In addition, the plaintiff incurred expenses of approximately $50,000 for the short term leasing of three tanks at GATX to obtain additional blending capacity to dilute the dark gasoline.

Texport blended Brazilian gasoline and raffinate with the Amolyntos cargo to make finished, marketable gasoline. The Court notes that this blending process must have increased the volume of finished gasoline which was sold at market value and without discount. The raffinate was purchased from Chevron at 43¢ or 43½¢ per gallon and, when blended, became part of the finished merchantable gasoline which was apparently sold for as much as 66¢ a gallon. By this calculation, the plaintiff apparently made a profit of up to 20¢ a gallon on the raffinate blended with the gasoline.

### The Defendant's Case

MICHAEL FARROW is a marine surveyor. On May 10, 1990, he boarded the Amolyntos on behalf of the owners of the vessel. Tanks five, eight and nine were resampled because of an alleged color problem. Farrow conceded that there was a color problem in tanks five, nine and the port keel duct as follows:

"Q All right.
Now, if you know, sir, were tanks five and nine dark?

A Yes, they were in comparison to the rest of the cargo.

Q Were tanks five and nine noticeably dark?

A Yes.

Q What about tank eight?

A Slightly darker than the remaining cargo, but that's all.

Q In your opinion, sir, was tank number eight significantly dissimilar from the other vessel tanks?

A No.

. . . .

Q All right.
Based on your attendance can you advise the Court whether the cargo in the port duct was clear or dark?

A It was dark.

Q Was it as dark as the cargo in either tank five or nine?

A It resembled the cargo in number nine.

Q And number nine, in your opinion, was that the worst on the ship?

A Yes.

Q And was the port duct also in a similar condition as number nine?

A Yes" (Tr. at pp. 487, 496).

On cross-examination, Farrow was asked why the cargo "went dark on the Amolyntos?" He responded that one reason could be "some residue of the vessel's previous cargo in the various tanks that contained the off-colored product," which "wasn't supposed to happen" (Tr. at p. 507). The Amolyntos last carried coal, preceded by a cargo of number six dark heating oil, a "very dark product" (Tr. at p. 517).

DR. CARL GRYTE is an expert in analytical chemistry. On behalf of the defendant, he inspected the vessel samples and participated in some of the joint analyses of the Amolyntos cargo by Caleb Brett in May 1990. Dr. Gryte testified that with the exception of tanks five, nine and the port duct keel, all the remaining samples were yellow. The gasoline unloaded for tanks five, nine and the port duct keel; "were all a dark amber brown" and were "not yellow" (Tr. at p. 641).

In August 1990, the same group performed tests in a composite sample representing the condition of the gasoline on all the tanks on the ship. The darkest product was less than 2.0 and the lightest was less than 1.5, with an average ASTM color for the vessel composite of 1.5, which, he says is yellow, including tanks five, nine and the duct keel.

Based on a review of all the documents, the laboratory testing and the prior testimony at the trial, when all the gasoline coming off the ship had been mixed together, Dr. Gryte was of the opinion that the color of the cargo was yellow.

However, on cross-examination Dr. Gryte conceded that some of the cargo darkened while on the Amolyntos:

"Q Professor Gryte, any doubt in your mind that some of this cargo darkened while it was on the vessel AMOLYNTOS?

A It certainly—certainly there was some of the cargo that was darkened while it was on board the AMOLYNTOS.

Q Why did it darken?

A I think other people have indicated, and most reasonably, a dark material—I think one of the previous cargoes was coal. And I think there was a six oil possibility as well—

THE COURT: There was a what possibility?

THE WITNESS: Six oil. The heavy bunker oil which is dark in color, most likely—it is speculation—but most likely in the transportation it caused the darkening of the tanks involved.

Q As a scientist did you yourself form any sort of hypothesis as to what made some of this cargo go black?

A It seemed to me—I didn't sit down to make a hypothesis, but it seemed to be reasonable to suspect that some contamination occurred from material that was reside in some position in the AMOLYNTOS, either tanks or piping systems.

. . . .

Q In fact, isn't it true that the loading, from the documents you have seen, the ship was rejected twice because of cleanliness?

A Yes, I believe so, yes.

Q And the cargo before that was the number six heating oil, the dark bunker oil that you just mentioned?

A That's correct, sir" (Tr. at pp. 719–721).

RICHARD W. GOLDEN is a consultant with regard to the buying and selling of petroleum products. He negotiates gasoline transactions. Golden reviewed the trial testimony and exhibits and was present at some depositions. Golden testified that the Romanian gasoline purchased by Texport was an unfinished product which did not meet the octane criteria to be sold in the United States. Also the gasoline RVP of 9.4 was higher than the standard in New York.

Golden stated that when Texport purchased raffinate from Chevron Co. for 43½¢ per gallon and blended it with the gasoline, the volume of the product increased:

"Q Okay.

Now, I asked certain questions about—of both Mr. Eubank and Ms. Garrison that I will ask you.

If you purchase Raffinate at 43.5 cents a gallon and it goes into gasoline, does the Raffinate lose its identity as Raffinate and become gasoline?

A Yes, it does.

Q And does your volume of gasoline increase by the amount of Raffinate that you have put into it?

A Yes, it does.

Q Now, if the Raffinate is 43.5 cents a gallon and gasoline is worth approximately 60 cents a gallon, has the value of the Raffinate increased by 17 cents a gallon?

A Certainly by the fact you have increased the volume, you have a lower cost factor and a higher return and it is increased by that volume" (Tr. at p. 788).

Golden also testified that there was no attempt by Texport to segregate the dark gasoline from the yellow product and that this procedure would be a departure from prudent practice. He stated that by commingling the dark and yellow gasoline, Texport exacerbated the color problem.

## DISCUSSION

### A. *Liability*

The Carriage of Goods by Sea Act ("COGSA") (46 U.S.C.App. §§ 1300–1315 [1988]) governs the rights and obligations of the parties in this lawsuit. Section 1303 imposes

a duty upon carriers to "exercise" due diligence to—"make the holds ... and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation." In addition, the statute further provides that "The carrier shall properly and carefully load, handle, stow, carry, keep, care for and discharge the goods carried."

■ In order to establish a *prima facie* case of a breach of this duty under COGSA, the plaintiff must prove that "the goods were damaged while in the carrier's custody." *Caemint Food Inc. v. Brasileiro,* 647 F.2d 347, 351 (2d Cir.1981) (quoting from *Pan American Hide Co. v. Nippon Yusen,* 13 F.2d 871 (S.D.N.Y.1921); *see also Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli,* 814 F.2d 115 (2d Cir.1987).

The cargo owner can prove that its goods were damaged while in the vessel's custody by proving "delivery of the goods to the carrier ... in good condition and outturn by the carrier ... in damaged condition." *Vana Trading Co. Inc. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.1977) *cert. denied* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

■ In addition, a clean bill of lading is ordinarily *prima facie* evidence of delivery in good condition. *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183, 1185 (2d Cir.1978); *Blasser Brothers Inc. v. Northern Pan-American Lines,* 628 F.2d 376, 381 (5th Cir. 1980).

■ There is an alternative method of establishing liability. Even if the shipper does not prove delivery in good condition, it may nevertheless establish a *prima facie* case for recovery by producing evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody. *Kanematsu Gosho Ltd. v. Messiniaki Aigli,* 814 F.2d 115, 118 (2d Cir.1987); *Caemint Food Inc. v. Brasileiro, supra.*

■ Further, a plaintiff shipper is not required to prove that the carrier was at fault, or how the damage might have occurred. *M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103 (2d Cir.1985); *Nissho–Iwai Co. Ltd. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2d Cir.1980). Once the shipper makes out its *prima facie* case, the burden shifts to the carrier to show that either it exercised due diligence to prevent the damage or that the cause of the damage fell within one of the COGSA exceptions set forth in 46 U.S.C.App. § 1304(2). *Associated Metals & Minerals Corp. v. S/S Jasmine,* 983 F.2d 410 (2d Cir. Jan. 7, 1993); *Siderius, Inc. v. M.V. Amilla,* 880 F.2d 662, 664 (2d Cir.1989); *M. Golodetz Export Corp. v. S/S Lake Anja, supra; Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 105 (2d Cir.1977).

■ In this case, with regard to the issue of liability, the Court finds that the plaintiff has established, by a preponderance of the credible evidence, that the gasoline was delivered to the defendant carrier while in a yellow color; that some of the cargo was caused to become darkened while in the ship; and that some of the gasoline was delivered in a darkened condition. The Court finds that the plaintiff established that the gasoline loaded onto the Amolyntos was darkened in tanks five, eight, nine and the port duct keel while in transit, by reason of the prior cargoes of coal and dark heating fuel. In addition, the Court finds that the gasoline in tanks five, eight, nine and the port duct keel, when delivered to Texport in New York, was darker than its original yellow color.

Initially, it is noted that there is a "clean" bill of lading in evidence (Plaintiff's Exh. 5). The bill of lading states that the gasoline was "shipped in apparent good condition by Petrolexport-import Bucharest on board the ... vessel Amolyntos."

Second, two defense witnesses testified that the gasoline in tanks five, nine and the port duct keel was dark when it arrived in New York. Moreover, Dr. Gryte, the defendant's expert, testified that the gasoline in tanks five, nine and the port duct keel "were all a dark amber brown" and "not yellow" and that the prior cargo of heating oil "most likely in the transportation ... caused the darkening of the tanks involved."

The Court finds that the gasoline that darkened during transit was in tanks five, eight, nine and the port duct keel.

Thus, the plaintiff made out a *prima facie* case and the defendant failed to prove that it exercised due diligence to prevent the damage or that the cause of the damage fell within one of the COGSA exceptions. Accordingly, the defendant is liable for the damages directly incurred by the plaintiff Texport with regard to ameliorating the darkened condition of the Texport gasoline carried by the Amolyntos in tanks five, eight, nine and the port duct keel.

### B. *Damages*

Reviewing the statute, 46 U.S.C.App. § 1304(5) provides that "In no event shall the carrier be liable for more than the amount of damage actually sustained." The issue is what compensable damage has the plaintiff proved, by a preponderance of the evidence, with regard to the darkened condition of part of the gasoline carried by the Amolyntos?

The measure of damages in a COGSA case of this nature was clearly set forth in *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli,* 814 F.2d 115 (2d Cir.1987), as follows:

"Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive. (Citations omitted).

. . . .

The computation of damages based upon fair market value is not the only method of measurement. Rather, as the Supreme Court has observed,

[t]he test of market value is at best but a convenient means of getting at the loss suffered. *It may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable.*

*Illinois Central Railroad v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930) (emphasis added), *quoted in Internatio [Inc. v. M.S. Taimyr],* supra, 602 F.2d [49] at 50 [ (2d Cir.1979) ]" (emphasis supplied) (814 F.2d at pp. 118, 119).

In *Kanematsu,* the Court discussed the alternative method of computing damages based on the cost of restoring the cargo to its original condition. The Court referred to the latter method of proving damages as "exceptional."

Of course, the law of damages in admiralty cases generally does not differ from the rule in ordinary contract cases. The shipper is under a duty to mitigate his losses. *M. Golodetz Export Corp. v. S/S Lake Anja,* supra, 751 F.2d at p. 1112; *Internatio Inc. v. M.S. Taimyr,* 602 F.2d 49, 50 (2d Cir.1979). In this case, although the plaintiff did commingle the dark and light gasoline in the barges and in the shore tanks, the Court finds that there is no evidence that such conditions increased the additional incidental damages referred to later in this decision. Further, the commingling was used as part of the color blending process and did not result in any enhanced damages payable by the defendant. While the duty to mitigate damages is on the plaintiff shipper, the burden to show failure to mitigate is on the defendant vessel. (*Emmco Insurance Company v. Wallenius Caribbean Line S.A.,* 492 F.2d 508 [5th Cir.1974]; *Compagnie De Navigation v. Mondeal United Corp.,* 316 F.2d 163 [5th Cir.1963] ).

Although the plaintiff's proof of damages was somewhat unclear and contradictory, it bases its claims on two theories. First, it claims that the darkened gasoline resulted in a loss of market value. Second, it makes a claim for additional or incidental expenses incurred by Texport in its efforts to transport, store and blend the gasoline so as to restore its marketable yellow color.

With regard to the claim for "loss of market value," the Court finds that the plaintiff failed to prove any diminution in the fair market value of the gasoline caused by the change in color. First, the proof established that the gasoline was sold at the market price without any discount. (*See e.g., Marathon Int'l Petroleum v. I.T.I. Shipping,* 766 F.Supp. 130, 134 [S.D.N.Y.1991] and cases cited). Second, the plaintiff's proof of diminution of market value was solely presented by Saul Quinn, whose testimony was not credited in that regard. Third, the increased

gasoline volume caused by the addition of more than 50,000 barrels of raffinate, with the ensuing profit to Texport, would have to be considered in mitigation of such damages, if any were established.

The plaintiff's alternative method of proving damages is the incidental additional costs incurred by the plaintiff in successfully restoring the darkened gasoline to the marketable yellow color. (*See e.g., Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli, supra,* 814 F.2d at p. 119; *Pacol (Canada) Ltd. v. M/V Minerva,* 523 F.Supp. 579, 583 [S.D.N.Y.1981] [plaintiff is also entitled to reasonable and necessary costs associated with sorting and reconditioning the beam]).

These additional costs were supported by the testimony of William Eubank that the regular blending for RVP and octane would only take a few days at most while the color blending process took three or four weeks. This delay was caused by the dark-colored gasoline and resulted in additional expenses that would not have been otherwise incurred. As amplified by Ms. Garrison, these expenses included demurrage (extra vessel rental charges caused by delay), extra equipment expenses, extra terminal expenses and additional interest on the financing. Also, there was evidence of additional laboratory expense paid to Caleb Brett as a result of the extensive and lengthy testing caused by the dark gasoline condition.

With regard to proof of the actual additional blending expenses, the plaintiff's proof was inhibited by the candid statements by the plaintiff's chief financial officer that she could not prove nor did she even know the amount of the additional blending costs. The Court finds that the plaintiff failed to establish the actual additional blending costs incurred to remedy the color of the darkened gasoline.

However, a review of the testimony and exhibits reveals that the plaintiff did prove, by a preponderance of the credible evidence, the following additional incidental costs incurred in the restoration of the darkened gasoline to the marketable yellow color:

1. Additional laboratory expenses incurred because of the dark color problem. (See Plaintiff's Exhibit 21; Pretrial Order Schedule ¶ A.5. or $31,974.00 less $7,166.81 [see Plaintiff's Exhibit 40]) $24,807.19

2. Extra barge equipment expenses because part of the cargo could not go to the Stolt Terminal as originally planned. The Court finds that Texport would have incurred expected lighterage freight for 320,000 barrels in the sum of $54,000 even without the color problem. Therefore, Texport's claim for extra barge equipment in the sum of $92,618.34 must be reduced by the sum of $54,000, for a net sum of $38,618.34. (See Tr. at pp. 226, 366 and Plaintiff's Exhibit 7). $38,618.34

3. Extra demurrage expenses. (Plaintiff's Exhibit 25) $21,063.60

4. Extra terminal expenses. (Plaintiff's Exhibits 41, 42) $49,738.41

5. Extra spill taxes. (Plaintiff's Exhibits 26, 40) $5,749.31

6. Additional interest due to Bulk Oil because the discharge of the Amolyntos cargo was delayed. (Plaintiff's Exhibit 16) $27,768.48

7. Although not directly related to the dark gasoline condition, in the pretrial order, the defendant admitted that it is responsible for a barge cancellation fee (Tr. at p. 230) $12,665.00

**TOTAL:** $180,410.33

---

The Court finds that the plaintiff failed to prove its claimed damages for "through-put" expenses, "swap contract" expenses, additional charge for letters of credit and extra finance costs.

## C. *Prejudgment Interest*

 In admiralty, interest is granted unless there are exceptional or peculiar circumstances. *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 310 (2d Cir.1987) *cert. denied* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981); *Socony Mobil Oil Co., Inc. v. Texas Coastal and International, Inc.*, 559 F.2d 1008, 1014 (5th Cir.1977); *American Zinc Co. v. Foster*, 441 F.2d 1100 (5th Cir.) *cert. denied* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); *Mid–America Transportation Co., Inc. v. Rose Barge Line, Inc.*, 477 F.2d 914 (8th Cir.1973). Prejudgment interest is in the nature of compensation for the use of the funds.

 In this Circuit the rate of interest rests within the sound discretion of the trial court. *Independent Bulk Transp., Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23, 26 (2d Cir.1988). Commenting on this rule in *Ingersoll*, Judge Pierce stated:

> " 'A [p]laintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations.' *Id.* at 27. In exercising this discretion, the district court determined that rather than using a single Treasury Bill rate applied retroactively over the relevant periods as initially proposed, using an average rate for each period would be fairer because the rate on Treasury Bills was subject to wide fluctuation during those periods. Accordingly, the district court applied rates ranging between 9.676% and 10.112%. We cannot say that in determining prejudgment interest based upon an average of prevailing Treasury Bill rates, which are short-term risk-free obligations, the district court abused its discretion." (829 F.2d at p. 311).

 Applying these rules to the damages determination in this case, the Court awards non-compound prejudgment interest to the plaintiff for all categories of damage except the demurrage award, in the sum of·$21,063.60. These demurrage expenses have not as yet been paid and the plaintiff would not be entitled to compensation for the use of such funds.

The prejudgment interest is to be determined from May 10, 1990 to the date of the entry of judgment at the average prevailing Treasury Bill rates.

## D. *The Collateral Source Problem*

Finally, the Court addresses the collateral source issue involving the prior insurance payment to Texport. As a result of the insurance payment to Texport in the sum of $650,000 and the carrier's waiver of its subrogation rights, the defendant asserts that "Texport can not recover twice" (Defendant's Pretrial Memorandum of Law at p. 6). The defendant further contends that the collateral source rule "is only applicable to tort claims particularly personal injury litigation, not commercial contract disputes, especially where the alleged contractual breach is not punitive or tortious in nature" (Defendant's Post Trial Memorandum of Law at p. 19). In this Court's view, this contention is without merit as the collateral source rule does apply to the facts of this case and the defendant cannot be credited with the insurance payment made to Texport.

 In tort cases, where the plaintiff receives benefits from a third party who is not connected with the defendant, these benefits are from a source "collateral" to the defendant, hence the name of the rule. These collateral source benefits, of course, reduce the financial loss to the plaintiff. Notwithstanding the fact that these collateral source payments decrease the damages and, if not credited, would result in a "windfall" or a double recovery, they are generally not admissible to mitigate the plaintiff's damages. The theory is that if there must be a windfall, it is generally fairer that the damaged person should profit, rather than let the wrongdoer be relieved of full responsibility. See 22 Am.Jr.2d, Damages at §§ 566–569; Restatement of the Law of Torts Second Edition § 920A; *see also e.g., Overton v. United States*, 619 F.2d 1299, 1305 (8th Cir.1980).

 The rule that collateral benefits are not deducted from the plaintiff's recovery

against the tortfeasor applies to insurance policies, whether maintained by the plaintiff or by a third party, with or without the right of subrogation. (See 22 Am.Jur.2d § 589 at p. 655; Restatement of Law of Torts, Second § 920A; *Gusikoff v. Republic Storage Co.,* 241 App.Div. 889, 272 N.Y.S. 77 [2d Dept 1934]; *Rexroad v. Kansas Power & Light Co.,* 192 Kan. 343, 388 P.2d 832 [Sup.Ct.Kan. 1964]; *Conley v. Foster,* 335 S.W.2d 904 [Ct. of App.Ky.1960]).

 This rule also applies to property damage claims. As far back as 1946, the Supreme Court of California held:

"Where a person suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of the damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer (citations omitted) ... The rule has been applied where the independent source is pension systems or charity. The most typical case is where the person suffering the damage has procured insurance protecting him against the loss, to which the wrongdoer did not contribute in procuring, and his insurer pays him for the loss suffered" (*Anheuser–Busch, Inc. v. Starley,* 28 Cal.2d 347, 170 P.2d 448 [1946]).

The courts in the United States are apparently divided on the question of whether the collateral source rule applies in a breach of contract action. (See e.g. *United States v. City of Twin Falls, Idaho,* 806 F.2d 862 [9th Cir.1986]; *Manilla School District v. Sanders,* 226 Ark. 270, 289 S.W.2d 529; *Consolidated Freightways, Inc. v. Moore,* 38 Wash.2d 427, 229 P.2d 882 [Sup.Ct.Wash. 1951]; and *In re Future Manufacturing Cooperative Inc.,* 165 F.Supp. 111 [D.C.Cal. 1958]; *Grover v. Ratliff,* 120 Ariz. 368, 586 P.2d 213).

In *Veverka v. Spinella,* 60 Misc.2d 529, 303 N.Y.S.2d 305 (Sup.Ct. Albany Co.1969), a case involving tort and contract claims, the Court ruled on the subject of the collateral source rule, as follows:

"The only remaining question is the effect of the plaintiff's insurance payments which covered the market value of the coins comprising his inventory. Again, there is a well established rule in this State to cover the point. A receipt of a total or partial sum from a collateral source, independent of the wrongdoer, does not lessen the recoverable damages, whether the action is tort or contract. This includes insurance payments. (*Gusikoff v. Republic Storage Co.,* 241 App.Div. 889, 272 N.Y.S. 77; Restatement, Torts § 920; *Lassell v. City of Gloversville,* 217 App.Div. 323, 217 N.Y.S. 128; *Herald Nathan Press, Inc. v. Bourges,* 161 Misc. 208, 291 N.Y.S. 650). The cases of *Briggs v. New York Central & H.R.R. Co.,* 72 N.Y. 26 and *Allen & Arnink Auto Renting Co. v. United Traction Co.,* 91 Misc. 531, 154 N.Y.S. 934 are indicative of the long line of cases supporting the plaintiff's position."

In addition to the cases cited in *Veverka,* see also *Anton v. Greyhound Lines,* 591 F.2d 103 (1st Cir.1978); *Ideal Mutual Insur. Co. v. Korean Reinsurance Corp.,* 657 F.Supp. 1174 (S.D.N.Y.1987); *Rutzen v. Monroe County Long Term Care Program, Inc.,* 104 Misc.2d 1000, 429 N.Y.S.2d 863 (Sup.Ct. Monroe Co.1980); Fleming, *The Collateral Source Rule and Contract Damages,* 71 Cal. L.Rev. 56 (1983).

 Applying the rules of law stated above to the facts of this case, the Court finds that the collateral source rule should apply. Notwithstanding the judicial debate concerning the applicability of the rule to a pure contract action, we do not have such a case at issue. This action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action. Under these circumstances, it is appropriate to apply the collateral source rule and the defendant cannot benefit by the prior insurance payment to Texport.

### Conclusion

The Clerk is directed to enter a judgment in favor of the plaintiff Texport Oil Company against the defendant M/V Amolyntos in the total sum of $180,410.33, together with the

appropriate prejudgment interest as stated in this opinion.

**SO ORDERED.**