**TEXPORT OIL CO., Appellant, Cross–Appellee,**

v.

**M/V AMOLYNTOS, Its engines, boilers, tackle and Amolyntos Shipping Co. Ltd., Appellees, Cross–Appellants.**

**Nos. 652, 800, Dockets 93–7579, 93–7657.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1993.

Decided Dec. 9, 1993.

due in the cargo hull of the cargo vessel the *M/V Amolyntos (Amolyntos)*. The *Amolyntos* was held liable for the incidental costs incurred by Texport in the restoration of Texport's gasoline to a marketable form.

On appeal, Texport requests a remand for a new determination of damages and a declaratory judgment that it is entitled to indemnification on a demurrage claim. The *Amolyntos* filed a cross-appeal one business day beyond the statutory fourteen-day limit. Fed.R.App.P. 4(a)(3). The *Amolyntos* alleges in its cross-appeal that the court erred (1) in holding that Texport's damages were cognizable under the Carriage of Goods by Sea Act (COGSA); (2) in applying the collateral source rule because a COGSA claim for damages is essentially a contract claim and the rule should not be applied to a contract case; and (3) in ruling that the *Amolyntos* should not recover costs under Fed.R.Civ.P. 68.

We reject Texport's claim for damages. We grant Texport's request for a declaratory judgment that it is entitled to indemnification on a demurrage claim. With respect to the *Amolyntos'* cross-appeal, we hold that the late filing of the notice of appeal is not a jurisdictional bar. We reject the *Amolyntos'* cross-appeal on the merits.

We affirm in part and reverse and remand in part.

John R. Foster, New York City (Waesche, Sheinbaum & O'Regan, on the brief), for appellant, cross-appellee.

James M. Textor, New York City (Joseph F. DeMay, Jr., and Cichanowicz Callan & Keane, on the brief), for appellees, cross-appellants.

Before: FEINBERG, TIMBERS, and MINER, Circuit Judges.

TIMBERS, Circuit Judge:

This is an appeal from a judgment entered in the Eastern District of New York, Arthur D. Spatt, *District Judge*, 816 F.Supp. 825 (E.D.N.Y.1993), for incidental damages sustained by the Texport Oil Company (Texport) when its gasoline was contaminated by resi-

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

Texport is a Houston-based oil and gasoline trading company that buys, blends, and sells gasoline and other products. In April 1990 Texport bought approximately 60,000 MT of Romanian gasoline from Bulk Oil, a Swiss company. The gasoline was purchased on C.I.F. terms so that the cost included insurance and freight. As sold, the gasoline was not marketable in the United States because the octane level was too low to meet United States standards. Texport intended to add 40,000 to 50,000 barrels of toluene to raise the octane level and lower the vapor pressure in order to meet those standards.

The toluene was to be added in one blending process that could be completed within twenty-four hours. The blending would be done after the cargo was off-loaded from the *Amolyntos* in New York.

The seller, Bulk Oil, arranged for the carriage of the gasoline to New York aboard the *Amolyntos*. In two separate shipments prior to the instant shipment, the *Amolyntos* had carried coal and number six heating oil, which has a much darker hue than gasoline.

The *Amolyntos* arrived at Constanza, Romania, on April 14, 1990. It was examined by surveyors retained by both Bulk Oil and the Romanian shipper. The surveyors twice rejected the *Amolyntos* because the port duct keel area was dirty. The starboard duct keel tunnel was not used at all because it was so dirty. Finally, the gasoline was loaded the next day. The vessel left Constanza on April 20, 1990. It arrived at New York on May 10, 1990.

When the *Amolyntos* arrived at New York, surveyors took several sets of gasoline samples. An independent company compared the samples taken in New York with samples taken in Romania. It found that several of the New York samples were substantially darker than the Romanian samples. Darker gasoline is less marketable than clear gasoline. Texport notified the cargo insurers in London of a possible cargo contamination. The cargo insurers came to New York and took two sets of samples over a period of eight days. They found that the gasoline was darker than when it had been loaded on the *Amolyntos*.

In order to sell the gasoline at the intended price, Texport mixed clear gasoline with the discolored gasoline at approximately nine parts to one. Although Texport had intended to blend the gasoline with toluene, the blending process that was now required was much more complicated. The toluene blending would have been done in a simple procedure within a twenty-four hour period. Such blending would have been done either in transit on board the barge that carried the gasoline from the *Amolyntos* to the on-shore terminal or in a tank at the terminal. Instead, the necessary additional blending required approximately fifty blends, took several weeks to complete, and required additional storage. The end result was gasoline that was saleable at the originally-intended color and price. Texport sold the gasoline to a third party at the market price with no discounts.

To cover its additional costs, Texport filed an insurance claim. Although it was unable to calculate its actual additional blending costs, Texport did submit the estimated blending costs and actual incidental expenses, including extra laboratory and barge expenses. The insurance claim eventually was settled with the London insurers. Texport received $650,000 and whatever subrogation rights the insurance company had against the *Amolyntos*.

Texport commenced the instant action for damages against the *Amolyntos*. *Texport Oil Co. v. M/V Amolyntos,* 816 F.Supp. 825 (E.D.N.Y.1993). On March 24, 1993, the court held the *Amolyntos* liable for the damages that Texport directly incurred in ameliorating the darkened condition of the gasoline. The court held that Texport had not proven the actual cost of blending but had proven the incidental costs incurred in the restoration of the gasoline to a marketable form. The court awarded Texport $180,410.33 in incidental damages. Non-compound prejudgment interest also was awarded. In addition, the court held that the collateral source rule should apply so that the damages paid by the *Amolyntos* would not be reduced by the insurance payments made to Texport by the insurance company.

On appeal, Texport requests a remand, claiming that it is entitled to fair market damages based upon diminution in the value of the gasoline. Texport further requests a declaratory judgment that it is entitled to indemnification for the demurrage caused by the additional blending time.

The *Amolyntos* cross-appeals, claiming that the district court erred (1) in finding that the cargo was damaged; (2) in applying the collateral source rule to this COGSA claim for damages; and (3) in ruling that the *Amolyntos* should not get costs under Fed.

R.Civ.P. 68. The cross-appeal was filed one business day late.

## II.

### (A) DIRECT APPEAL

#### (1) Calculation of Damages

■ The court awarded damages based upon Texport's incidental expenses and pre-judgment interest. Texport asserts that the court erred and should have awarded damages based upon diminution in market value. After reviewing the court's decision, we hold that there was not an abuse of discretion. As to this, we affirm.

■ The general measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value of the goods in the condition in which they actually did arrive. *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2 Cir.1987) (citing *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 18 (2 Cir.1969), *cert. denied*, 397 U.S. 964 (1970)). This is not a hard and fast rule. When circumstances suggest a more appropriate alternative, the fair market test may be superseded by another method of calculating damages. *Illinois Cent. R.R. v. Crail*, 281 U.S. 57, 64–65 (1930). Ultimately, under COGSA, "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained". 46 U.S.C. § 1304(5) (1988).

In the instant case, Texport was able to salvage the tainted gasoline by blending it with clean gasoline. There is no dispute that the value of the gasoline that arrived in New York was less than its value when it was loaded on the *Amolyntos* in Romania. After the blending process, however, Texport was able to sell all of the blended gasoline—including the reconditioned gasoline and all of the blending gasoline—at the full market price. Since Texport sustained no diminution in the value of the gasoline, the court was correct in not measuring Texport's damage by the fair market value.

Texport was able to prove its incidental damages. The costs were incurred in reconditioning the gasoline that was damaged due to the *Amolyntos'* neglect. Since the gas was sold at full market value, Texport's incidental damages are the most accurate measure of its true damages and thus a valid alternative for measuring damages in a COGSA action.

We affirm the district court's holding that the *Amolyntos* is liable to Texport for the incidental damages.

#### (2) Declaratory Relief for Indemnification of the Demurrage Claim

■ Texport requested that the court enter a declaratory judgment stating that Texport is entitled to be indemnified by the *Amolyntos* for the extra vessel rental expense, known as demurrage. The court denied that request.

According to the original agreement between Bulk Oil and Texport, the latter was required to pay the costs for any time over three days spent in discharging the *Amolyntos*. Since the blending was more involved than expected, Bulk Oil presented Texport with a $135,208.34 bill for demurrage covering the additional seven days. Texport contests this bill and currently is in litigation over the matter in a British court.

The court denied Texport's request for a declaratory judgment. *Texport, supra*, 816 F.Supp. at 843. The court later entered an order denying Texport's second request for a declaratory judgment on this matter.

■ Although the demurrage matter currently is before a British court, the district court has discretion to grant a declaratory judgment on an issue that is pending in another court. Fed.R.Civ.P. 57. We have the power to reverse the district court's exercise of that discretion when the exercise was an abuse of discretion. *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2 Cir.), *cert. denied*, 501 U.S. ——, 111 S.Ct. 2829 (1991). The standard of our review of the court's exercise of discretion is *de*

*novo.* *Continental Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2 Cir.1992). When reviewing the court's exercise of discretion in granting or denying a declaratory judgment, we must consider whether the case falls into one of two situations: " '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding' ". *Broadview Chem. Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2 Cir.1969), *cert. denied,* 397 U.S. 1064 (1970) (quoting Borchard, *Declaratory Judgments* 299 (2d ed. 1941)).

We hold that the court erred in refusing to grant the declaratory judgment. The court has already established that there is a legal relationship between the parties and that the *Amolyntos* is responsible for the discoloration of the gasoline and the resultant costs of the blending. The issue of indemnification turns on whether the *Amolyntos* is responsible for the delay. Since that responsibility already has been proven, a declaratory judgment would settle this legal issue. Furthermore, the court already has heard all of the arguments and viewed the evidence. A declaratory judgment will alleviate the need for an entire new trial if Texport loses the case in London.

As to this, we reverse and remand for a declaratory judgment in favor of Texport on the issue of the *Amolyntos'* responsibility for the delay, subject to its right to contest the amount of indemnity it may have to pay to Texport.

## (B) CROSS–APPEAL

On cross-appeal, the *Amolyntos* contends that the court erred (1) in holding the *Amolyntos* liable for damages under COGSA since, the *Amolyntos* contends, the gasoline was not damaged when Texport took delivery; (2) in applying the collateral source rule; and (3) in holding that Fed.R.Civ.P. 68 does not apply. The threshold question, however, is whether we should entertain the cross-appeal at all since the *Amolyntos* filed its notice of appeal beyond the fourteen day period of limitations.

### (1) *Federal Rule of Appellate Procedure 4(a)(3)*

Under Rule 4(a)(3), a cross-appeal must be filed within fourteen days of the filing of a timely notice of appeal. Texport filed its notice of appeal on June 11, 1993. The *Amolyntos* had until Friday, June 25, 1993, to file a cross-appeal. The *Amolyntos'* attorney mistakenly wrote the wrong date in his diary and filed the notice of cross-appeal on Monday, June 28, 1993. Texport moved to dismiss the cross-appeal for failure to comply with Rule 4(a)(3). The motion was referred to us. We deny Texport's motion.

In the past, there has been some conflict in our Court as to whether the late filing of a notice of cross-appeal is a matter of practice or is a jurisdictional bar. We adhere to our recent decision that "the requirement of a cross-appeal is a rule of practice which is not jurisdictional and in appropriate circumstances may be disregarded". *Finkielstain v. Seidel,* 857 F.2d 893, 895 (2 Cir.1988). We believe that this is an appropriate case in which to exercise our discretion and disregard the time requirement. Here, the direct appeal and the cross-appeal are closely interrelated because they involve damages between the same parties in the same action. Further, the notice of cross-appeal was filed only one business day late. Finally, defendants were neither surprised nor in any way prejudiced by the cross-appeal.

Since this is not a case requiring rigid adherence to the rules, we hold that the *Amolyntos'* cross-appeal may be heard. Although the *Amolyntos'* cross-appeal passes this first threshold test, however, we reject the three *Amolyntos* claims in its cross-appeal on their merits. As to this, we affirm.

### (2) *Damage to the Cargo*

First, the *Amolyntos* claims that the cargo was not damaged when delivered in New York. Both parties agree that a shipper's liability does not arise until delivery

and delivery does not occur until the gasoline actually leaves the vessel. The *Amolyntos* contends that the fact that predelivery samples from some cargo holds were darker than samples from other cargo holds is not enough to prove damage of the entire shipment as delivered. The *Amolyntos* further contends that, if the color of the entire shipment were averaged out, the composite color would be a light yellow shade. We reject this contention.

The facts indicate that the shipment was too large to mix in one giant tank. In order to thin out the damaged gasoline to reach the desired color, it was necessary to conduct extended blending processes on the transport barges and in the on-shore tanks. Although the *Amolyntos* might be correct technically that the average color was light enough to be saleable, in practice there was no way to reach that composite color without the extended blending. The court, therefore, was not clearly erroneous in finding that the gasoline as delivered in New York was darker in hue and thus less marketable than the gasoline that was loaded on the *Amolyntos* in Romania.

### (3) *Collateral Source Rule*

 Second, the *Amolyntos* claims that the collateral source rule should not apply in this case because COGSA cases are essentially contract cases. We disagree that this is a simple contract case. As the court stated, "[t]his action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action". *Texport, supra,* 816 F.Supp. at 844.

Furthermore, the fact that Texport entered into an independent contract with a third-party insurer to indemnify any loss does not insulate the *Amolyntos* from full liability. Restatement (Second) of Torts § 920(A)(2) (1989); *William Z. Salcer, Etc. v. Envicon Equities,* 744 F.2d 935, 941 (2 Cir. 1984) ("The essence of the collateral source rule is the independence of the transaction giving rise to the collateral source, such as the insurance policy."). The proper question

to ask in these circumstances is who should receive the windfall if Texport wins on its insurance claim?—the wronged or the wrongdoer? Clearly, Texport, as the wronged party, should benefit from the insurance for which it paid when purchasing the gasoline C.I.F. Furthermore, by assigning that right to Texport, we do not impose a double burden on the *Amolyntos* since the *Amolyntos* did not pay for the insurance. *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534 (9 Cir.1962) (a tortfeasor bears only the single burden imposed by society "not only to make the plaintiff whole, but also to deter negligence and encourage due care"). As to this, we affirm.

### (4) *Federal Rule of Civil Procedure 68*

 Third, the *Amolyntos* claims that the court's rejection of its claim for costs under Rule 68 should be reversed. This rule applies when a party makes a monetary offer more than ten days before trial and the offeree rejects the offer. If the final judgment obtained by the offeree at trial is not more favorable than the offer, then the offeree must pay the costs incurred by the offeror after the offer was made. We disagree with the *Amolyntos'* contention.

Approximately one year before trial, the *Amolyntos* made an offer of judgment under Rule 68 for $150,000. Texport rejected the offer. The final judgment after trial was $180,410.33. The court entered an order denying a post-trial motion by the *Amolyntos* that asserted that the *Amolyntos* was entitled to its costs under the rule. The basis for the *Amolyntos'* assertion was that Texport raised additional damage claims at trial, and that the *Amolyntos* would have included these damages in its offer of judgment if they had been raised before the Rule 68 period had expired. Thus, the *Amolyntos* argued that its offer should be construed as "more favorable" than the final judgment award for the purposes of Rule 68. The court denied the motion, holding that the plain language of Rule 68 controls. Since the final judgment was for $30,410.33 more than the offer, the plain language of Rule 68 gov-

erns. The *Amolyntos* cannot recover costs under Rule 68. As to this, we affirm.

### III.

To summarize:

The court properly held that Texport was not entitled to the fair market value of the gasoline but was entitled to incidental costs. The court erred in denying Texport's request for a declaratory judgment that it is entitled to indemnification of the demurrage expenses caused by the delay. Fed.R.App.P. 4(a)(3) is a rule of practice that may be disregarded. The *Amolyntos* is permitted to assert its cross-appeal despite filing it one day late. The court, however, properly held that the gasoline was delivered in a damaged state; that the collateral source rule applies in a COGSA case; and that the *Amolyntos* should not recover costs under Fed.R.Civ.P. 68.

Affirmed in part, reversed and remanded in part.