United States Court of Appeals,

Fifth Circuit.

No. 93-3524.

ASSOCIATED METALS AND MINERALS CORPORATION, Plaintiffs-Appellees,

v.

ALEXANDER'S UNITY MV, her engines, boilers, etc., et al.
Defendants,

Banque Internationale A Luxembourg S.A., Claimant-Appellant.

Jan. 9, 1995.

Appeals from the United States District Court for the Eastern
District of Louisiana.

Before KING, JOLLY and STEWART, Circuit Judges.

KING, Circuit Judge:

This case concerns damage to maritime cargo. In the lower
court, Associated Metals and Minerals Corporation argued, and the
district court agreed, that damage to its cargo transported by the
*M/V Alexander's Unity* resulted not only from the breach of the
contract of carriage by the vessel but also from the physical and
financial unseaworthiness of the vessel and the negligence of her
owners and/or operators. The district court's judgment recognized
that Associated Metals and Minerals had a preferred maritime tort
lien for the full amount of its claim, priming the liens of the
preferred ship mortgages held by Banque Internationale A Luxembourg
S.A. The district court also determined that the expenses incurred
by Associated Metals and Minerals in discharging its cargo were
*custodia legis.* Banque Internationale A Luxembourg S.A., which was
also awarded a default judgment and *custodia legis* expenses in a

1

separate proceeding, appeals the district court's findings that: (1) Associated Metals' claims are tort claims and therefore entitled to preferred maritime lien status and (2) Associated Metals' expenditures surrounding the removal of the cargo were *custodia legis* expenses. We find that we have jurisdiction over this matter and affirm the rulings of the district court.

## I. BACKGROUND

In early May of 1992, the *M/V Alexander's Unity,* a bulk carrier travelling under the Maltese flag, arrived in India at the port of Visakhapatnam. After discharging its cargo, the ship was moved to another berth for the loading of steel plates for transport to the ports of Houston and Mobile pursuant to a May 15, 1992 charter agreement between Alexander's Unity Shipping Company, Ltd. Valletta ("Alexander's Unity Shipping") and Associated Metals and Minerals Corporation ("Associated Metals"). Over seven thousand pieces of steel were loaded into three of the *Alexander's Unity*'s hatches. While in Visakhapatnam, the ship also picked up a cargo of high carbon ferro chrome for transport to New Orleans; later, after sailing to the port of Paradip, the *Alexander's Unity* received a cargo of chrome also bound for delivery in New Orleans.

While the ship was discharging and loading its various cargos in India, the ship's master and the port engineer, a representative of Alexander's Shipping, discussed the upcoming voyage. The Master, aware that the cargo of steel was "sensitive to sea water," expressed concern that the ship would encounter high winds and rough seas traveling around the Cape of Good Hope during winter.

2

His apprehension was magnified by the condition of the hatch covers, which had been in disrepair for some time and which the Master believed likely would allow water to seep through them. The Master pointed out his concerns and requested permission to travel through the more tranquil Suez canal. Unwilling to pay the fees associated with traveling through the Suez canal, Alexander's Shipping's representative ordered the ship to proceed around Africa. Additionally, instead of removing the hatch covers or placing the ship in dry dock for repair, the hatch covers were patched with "asphalt tape." Thus loaded, the *Alexander's Unity* set sail for the United States in June of 1992.

In late June, during the journey to the United States, the Master's concerns came to fruition, and the ship encountered weather and seas so rough that the ship's log reflects that "waves cover[ed] the deck" for several days. During the inclement conditions, seawater evidently penetrated the hatch covers and cargo holds, necessitating the operation of the bilge pumps for several days in late June and early July. Except for some engine repairs at the end of July, the rest of the voyage was relatively uneventful, and the *Alexander's Unity* arrived in New Orleans on July 30, 1992.

Upon its arrival in New Orleans, the *Alexander's Unity* suffered the first of several arrests. The ship had outstanding debts to numerous groups including the appellant in this matter, Banque Internationale A Luxembourg S.A. ("BIL"). Specifically, BIL held two mortgages on the *Alexander's Unity,* and on the basis of

3

these debts, BIL initiated an *in rem* action against the ship. Associated Metals also initiated an *in rem* action against the *Alexander's Unity* as well as *in personam* actions against Alexander's Unity Shipping and Alexco Shipmanagement (Hellas) Ltd., the vessel's operator.

On October 29, 1992, the United States Marshal sold the *Alexander's Unity* and the proceeds of $4,615,000 (less the Marshal's commission and certain *custodia legis* expenses) were placed in the court's registry. From these funds, outstanding debts owed to the Master and crew of the ship and to domestically based suppliers were paid; nevertheless, more than four million dollars still remains in the registry of the court.

In April of 1993, Associated Metals sought a default judgment against the *Alexander's Unity,* Alexander's Unity Shipping, and Alexco Shipmanagement (Hellas) Ltd. Specifically, Associated Metals sought $736,873 for seawater rust damage to the steel plates. Associated Metals also requested $181,340.97 for expenses resulting from the forced discharge of the steel in New Orleans instead of in Houston and in Mobile, the original destinations of the cargo. Additionally, Associated Metals argued that it was entitled to interest and that the full amount of its claim constituted a preferred maritime tort lien. Finally, Associated Metals asserted that its costs from the forced discharge were *custodia legis* expenses.

In late May, the district court granted a default judgment in favor of Associated Metals in the amounts requested. Specifically,

in a minute entry, the district court found that *Alexander's Unity* was engaged in the common carriage of cargo, and that Associated Metals' cargo aboard the ship was "damaged not only from the breach of contract of carriage by the vessel but also from the physical and financial unseaworthiness of the vessel and the negligence of her owners and/or operators." The district court also determined that "under admiralty law, Associated rightfully has a claim in tort for negligence and such a claim is a preferred maritime tort lien against the vessel, ... [and] Associated's preferred maritime tort lien against the vessel encompasses both the seawater rust damage to the cargo and the forced discharge expenses." The district court later modified the judgment to include an additional $70,889.95 in forwarding expenses. This sum was not added to the *custodia legis* expenses, but was added to the preferred maritime tort lien because the district court concluded that "the financial unseaworthiness of the *M/V Alexander's Unity* was the proximate cause of these unanticipated forwarding expenses." Thus, on June 23, 1993, the district court entered its minute entry and modified default judgment consisting of a preferred maritime tort lien in the amount of $918,213.97 plus five percent interest from the date of discharge; $110,451.02 of that sum was recognized as *custodia legis* expenses. BIL appeals from this order.

## II. STANDARD OF REVIEW

BIL does not challenge the grant of the default judgment, the district court's findings of unseaworthiness and negligence, or the determination that the *Alexander's Unity* was a common carrier.

5

Instead, BIL contests the application of the law to the findings contained within the judgment and the determination that the discharge expenses were *custodia legis.* It is well settled that a district court's findings of fact must be accepted unless clearly erroneous. *Prudhomme v. Tenneco Oil Co.,* 955 F.2d 390, 392 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 48 (1992). On the other hand, "we review *de novo* the legal questions decided by the district court." *Landmark Land Co. v. Office of Thrift Supervision,* 990 F.2d 807, 809 (5th Cir.1993); *accord Prudhomme,* 955 F.2d at 392. Finally, we examine determinations of *custodia legis* expenses for abuse of discretion. *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.,* 10 F.3d 176, 181 n. 3 (3d Cir.1993); *Taino Lines, Inc. v. M/V Constance Pan Atlantic,* 982 F.2d 20, 24 (1st Cir.1992); *Kingstate Oil v. M/V Green Star,* 815 F.2d 918, 922-23 (3d Cir.1987).

### III. ANALYSIS

A. Jurisdiction

Because there are still aspects of this case pending in the district court, our jurisdiction to decide the issues presented in this case must be addressed. Generally, appellate courts only have jurisdiction over final decisions of district courts. *See* 28 U.S.C. § 1291. There is, however, an exception allowing review of certain interlocutory decisions. Section 1292(a)(3) of 28 U.S.C. provides that "the courts of appeals shall have jurisdiction of appeals from ... [i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the

6

parties to admiralty cases in which appeals from final decrees are allowed." *See Todd Shipyards Corp. v. Auto Transp., S.A.,* 763 F.2d 745, 751 (5th Cir.1985); *Gulf Towing Co. v. Steam Tanker, Amoco New York,* 648 F.2d 242, 244 (5th Cir.1981) (per curiam). Although in order for this exception to apply, it is not necessary for "all of the rights and liabilities of all of the parties [to] be determined," *Gulf Towing Co.,* 648 F.2d at 244, to fall within the ambit of § 1292(a)(3) "the order appealed from must conclusively determine the merits of a claim or defense." *Kingstate Oil,* 815 F.2d at 921; *accord All Alaskan Seafoods, Inc. v. M/V Sea Producer,* 882 F.2d 425, 427 (9th Cir.1989); *see also Todd Shipyards Corp.,* 763 F.2d at 751 (finding § 1292(a)(3) applicable when a district court's ruling determined all rights and liabilities among the parties and calculated almost all recoverable damages).

For an order to "conclusively determine the merits of a claim or defense," it is not necessary for that claim to be extinguished. Rather, in certain situations, a court's order determining the priority of claims for all practical purposes may be conclusive of the rights of the parties to collect the claim and thus be determinative for § 1292(a)(3) purposes. For example, the Third Circuit in *Kingstate Oil* found that because the "mortgagee's and crew's preferred liens far exceed[ed] the proceeds from the sale of the vessel," the district court's interlocutory determination of the priority of claimants to the fund was appealable under § 1292(a)(3). 815 F.2d at 922. The court reasoned that the limited

7

funds available to creditors required them to "pierce theory and look at reality. For although, in the abstract, appellants may still assert their claims, their nether position on the creditor's totem pole converts this assertion into a fruitless gesture." *Id.* Consequently, the court concluded that the district court's determination of priority conclusively determined those appellant's claims and was reviewable under § 1292(a)(3). *Id.*

Similarly, the Ninth Circuit in *All Alaskan Seafoods,* found that § 1292(a)(3) conferred appellate jurisdiction over a district court's determination of the lien status of a claim. 882 F.2d at 427-28. The court found that because there was simply not enough money to satisfy all of the claims, the district court's decision to give the mortgage claim priority over "All Alaskan's lien claim constitute[d] a final determination of All Alaskan's right to recover anything for its cargo loss under any theory." *Id.*

The instant matter is similar to *Kingstate Oil* and *All Alaskan Seafoods.* Here, the district court's ruling, for all intents and purposes, will be dispositive of the claims in this case. As noted above, there is slightly more than four million dollars in the registry of the court. Associated Metals' judgment is slightly under a million dollars, and BIL's mortgages amount to nearly nine million dollars. Simply put, there is not enough money in the court's registry for all of the claims to be paid. Thus, the determination of whether the award to Associated Metals is entitled to preferred maritime tort lien status and is therefore entitled to disbursement ahead of BIL in reality will determine

8

whether Associated Metals collects its judgment.  Accordingly, we find that we have jurisdiction over this matter pursuant to 28 U.S.C. § 1292(a)(3).

B. Type of Lien

The primary question raised in this appeal is whether the district court erred in concluding that Associated Metals' award for cargo damage stems from a tort claim and is thus entitled to preferred maritime lien status.  We find that the district court was correct in its determination.

This controversy is rooted in the Ship Mortgage Act, 46 U.S.C. §§ 31301-43.  The Act was enacted in 1920 to improve lienholders' security and to encourage investment in the shipping industry.  *All Alaskan Seafood*, 882 F.2d at 428.  *See generally,* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9-5 (2d ed. 1994).  The Act provides that the holder of a preferred ship mortgage has priority over almost all other claims on the vessel except for preferred maritime liens and costs and expenses in *custodia legis*.[1]

---

[1]Specifically, the section, entitled "Court Sales to Enforce Preferred Mortgage Liens and Maritime Liens and Priority of Claims," provides:

(a) When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated, including a possessory common law lien ... and the vessel is sold free of all those claims.

(b) Each of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that—

(1) the preferred mortgage lien, including a

46 U.S.C. § 31326; *All Alaskan Seafood,* 882 F.2d at 428; *Oriente Commercial, Inc. v. American Flag Vessel, M/V Floridian,* 529 F.2d 221, 222 (4th Cir.1975). Moreover, the Act further describes that a " "preferred maritime lien' means a maritime lien on a vessel ... for damage *arising out of maritime tort.*" 46 U.S.C. § 31301(5)(B) (emphasis added). Thus, we are faced with the question of whether the cargo damage award to Associated Metals is entitled to a preferred maritime lien, for this is a case where "[d]etermining priorities among maritime liens is important [because] upon foreclosure and sale of [the] vessel there is not enough money to satisfy all of the claims." Schoenbaum, *supra,* § 9-6.

1. Historical Background

Nearly a century ago, in *The John G. Stevens,* 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898), the Supreme Court announced that a claim for damage to cargo could sound in tort, irrespective of whether a contract governing the carriage of those goods existed. *The John G. Stevens* Court primarily discussed whether a claim by a tow against her tug for damages resulting from negligent towing gave rise to a tort claim, and the Court found that such a claim existed. But the Court did not stop there. In fact, the Court specifically noted that "even an action by a passenger, or by an owner of goods, against a carrier, for neglect to carry and deliver

---

preferred mortgage lien on a foreign vessel whose mortgage has been guaranteed ... has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court and preferred maritime liens)....

46 U.S.C. § 31326.

10

in safety, is an action for the breach of a duty imposed by the law, independently of contract or of consideration, and is therefore founded in tort." *Id.* at 125, 18 S.Ct. at 549.

This sentiment was echoed in *The Henry W. Breyer,* 17 F.2d 423 (D.Md.1927). In that case, the court was required to characterize the claim of an owner of cargo damaged during maritime transport. The court found that:

> [t]he intervening libels of the shippers sound in tort, on the theory that they are entitled to recover damages for breach of the carrier's common-law duty, notwithstanding that the carrier's default was also a breach of the contract expressed in the bill of lading.... *It is well established that ordinarily the owner of goods damaged by the dereliction of a common carrier has the option to bring in an action either in contract or in tort.*

*The Henry W. Breyer,* 17 F.2d at 429 (emphasis added); *see also Stevens v. The White City,* 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932) (holding "that suit for an injury to the tow caused by the negligence of her tug is a suit *ex delicto* and not *ex contractu,*" regardless of the existence of a contract); *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 372, 53 S.Ct. 173, 174-75, 77 L.Ed. 368 (1932) (finding that in a maintenance and cure case "the remedy upon the contract does not exclude an alternative remedy based upon the tort.").

Thus, the statements in *The John G. Stevens* and *The Henry W. Breyer* gave rise to the notion, generally accepted by commentators, that, in certain situations, maritime damage to cargo gave rise to potential claims either in contract or in tort. *See, e.g.,* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 630 (2d ed. 1975) ("Cargo damage caused by improper loading, stowage, custody,

11

etc. ... may be looked on as arising out of contract (under the bill of lading or charter-party) or out of tort."); William Tetley, *Maritime Liens and Claims* 309 (1985) ("In the U.S., claims for cargo loss or damage on the carrying vessel may be pleaded in two ways; as a breach of the contract of affreightment or as a tort.").

Further, the idea that damage to cargo may give rise to a hybrid contract/tort claim has been embraced by the Second, Fourth, and Ninth Circuits. *See Texport Oil Co. v. M/V Amolyntos,* 11 F.3d 361 (2d Cir.1993); *All Alaskan Seafoods, Inc. v. M/V Sea Producer,* 882 F.2d 425 (9th Cir.1989); *Oriente Commercial, Inc. v. The American Flag Vessel,* 529 F.2d 221 (4th Cir.1975). For example, in *Oriente Commercial,* the Fourth Circuit confronted a situation nearly identical to the case at bar. There, citing *The John G. Stevens* and *The Henry W. Breyer,* the court concluded that a claim for damage to cargo "sound[ed] in tort." 529 F.2d at 223. Similarly, the Ninth Circuit in *All Alaskan Seafoods, Inc. v. M/V Sea Producer,* held that the breach of the duty of care with respect to the owner of cargo "can give rise to tort liability irrespective of contract obligations between the parties." 882 F.2d at 430. Most recently, the Second Circuit rejected the notion that cases for damages to cargo are simple contract actions, noting that an "action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action." *M/V Amolyntos,* 11 F.3d at 367.

Despite these precedents, BIL asserts that the Fourth and

12

Ninth Circuits (and implicitly the Second Circuit) have misapplied the law. In particular, BIL asserts that the Supreme Court's decision in *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and its progeny in this circuit require us to find that when the only damage in a cargo claim is to the cargo itself, there is no action in tort; instead, the remedy lies solely in contract. Thus, based on a mere contract claim, an award of cargo damages cannot constitute a preferred maritime lien. BIL further asserts that since this case is governed by COGSA, any tort claim Associated Metals might raise regarding the damage to its cargo is preempted by that statute. Finally, BIL argues that construing Associated Metals' claim as a tort claim would be an unwarranted extension of the law and would contravene the purposes of the Ship Mortgage Act. We reject all of BIL's contentions.

2. *East River Steamship*

BIL first looks to *East River Steamship* to support its contention that a claim for maritime cargo damages is cognizable only in contract. In that case, the Supreme Court was confronted, *inter alia,* with the question of whether, in a products liability claim, "injury to a product itself is the kind of harm that should be protected by products liability or left entirely to the law of contracts." *East River Steamship Corp.,* 476 U.S. at 859, 106 S.Ct. at 2296. After examining the development of products liability law in general and the purposes of tort law, the Court determined that "[w]hen a product injures only itself the reasons for imposing a

13

tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* at 866, 106 S.Ct. at 2299-300. The Court further reasoned that:

> [d]amage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received insufficient product value.... [A] claim for a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product and sue for breach of contract.

*Id.* at 872, 106 S.Ct. at 2302-03 (internal quotations and citation omitted). Thus, the Court concluded, "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871, 106 S.Ct. at 2302; *accord Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 927 (5th Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988).

In *Employers Insurance v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752 (5th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989), we examined *East River Steamship* and concluded that "*East River's* broad concern for preserving the integrity of contract law in commercial settings applies equally to a case ... where the professional services are an integral part of the manufacture or construction of a product and where the only injury alleged is to the product itself." *Id.* at 763. Accordingly, we found that when injury to a product itself is allegedly caused by negligent professional services rendered in connection with the manufacture or the construction of that product, there is no cognizable maritime tort cause of action. *Id.* at 766. BIL argues

14

that the rationale underlying the decisions of *East River Steamship, Shipco 2295,* and *Suwannee River* applies to claims such as that made by Associated Metals.  We reject this contention.

The decisions discussed above applied to claims where the damage was to a product whose manufacture or design was the basis of a contractual relationship.  Thus, in *East River Steamship,* the claim centered around defective turbines, and the Court held that a "manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory *to prevent a product from injuring itself* " and emphasized that a "*damage to a product itself* is most naturally understood as warranty claim." *East River Steamship,* 476 U.S. at 871-72, 106 S.Ct. at 2302 (emphasis added).  Similarly, in *Shipco 2295,* we applied the rule of *East River Steamship* and concluded that "economic loss for *damage to the product bargained for, the vessels in this case, cannot be recovered in tort.*"  *Shipco 2295,* 825 F.2d at 929 (emphasis added).  *Suwannee River,* also applying the rule of *East River Steamship,* was limited to the situation in which a product was damaged by deficient professional services "rendered in connection with *the manufacture or construction of a product.*" *Suwannee River,* 866 F.2d at 761 (emphasis added).  Consequently we noted that, "*East River's* broad concern for preserving the integrity of contract law in commercial settings applies equally to a case ... where the *professional services are an integral part of the manufacture or construction of a product and where the only injury alleged is to the product itself.*"  *Suwannee River,* 866 F.2d

15

at 763 (emphasis added). The damage to Associated Metals' cargo does not present such a case.

In deciding whether to apply the rule of *East River Steamship,* the central question is "what is the product?" *Shipco 2295,* 825 F.2d at 928. In the instant case, unlike the situation in *East River Steamship, Shipco 2295,* and *Suwannee River,* there is no product; the contract plainly was unrelated to the design or manufacture of a product. Instead, Associated Metals and Alexander's Unity Shipping contracted for the carriage of goods. Contrary to the situation of damage to a product itself, which is "most naturally understood as a warranty claim," *East River Steamship,* 476 U.S. at 871-72, 106 S.Ct. at 2302, "it is well established that ordinarily the owner of goods damaged by the dereliction of a common carrier has the option to bring in an action either in contract or in tort." *The Henry W. Breyer,* 17 F.2d at 429; *accord All Alaskan Seafoods,* 882 F.2d at 425; *Oriente Commercial,* 529 F.2d at 225.[2] The rule of *East River Steamship* and its progeny applies when the negligent design, professional service, or other process integral to the manufacture or construction of the product results in only injury to the product itself. We will not extend this rule to eviscerate the long standing tort cause of action for damage to cargo simply

---

[2]We also reject BIL's invitation to reformulate the language of *East River Steamship* and subsequent cases to apply generally, not just to products, but to the object of any maritime contract. We are aware of no cases (and BIL cites none) that make this leap away from the traditional treatment of negligence in the carriage of goods.

because a contract action may also exist.

3. COGSA

BIL also argues that COGSA governs the contract of shipping, and that Congress preempted the possibility of tort actions for the damages of cargo to which COGSA applies. We find this contention without merit. It is true that COGSA is applicable to all contracts of carriage of goods by sea, 46 U.S.C.App. § 1300,[3] and that claims surrounding the contract of carriage are governed by the rights and immunities of the Act. 46 U.S.C.App. § 1302.[4] It does not follow from this, however, that in enacting COGSA Congress meant to provide only contractual remedies for damage to cargo carried by sea.

COGSA was enacted in 1936 as part of an international effort to allocate the risks of loss or damage to cargo transported internationally. Michael F. Sturley, *The History of COGSA and the Hague Rules,* 22 J.Mar.L. & Com. 1, 5 (1991); Gilmore & Black, *supra,* at 139-45. Prior to the enactment of COGSA and its international analogue, the Hague Rules, a carrier was strictly liable for damage to cargo unless it could show both that its negligence had not contributed to the loss and that the loss was

---

[3]COGSA provides that "[e]very bill of lading or similar document of title which is evidence of a contract of goods by sea to or from ports of the United States, in foreign trade, shall have the effect subject to the provisions of this chapter." 46 U.S.C.App. § 1300.

[4]COGSA mandates that, subject to certain provisions, "under every contract of carriage of goods by sea, the carrier in relation to the loading, handling, towage, carriage, custody, care, and discharge of such goods, shall be subject to the rights and immunities set forth [in the Act]." 46 U.S.C.App. § 1302.

17

caused by either an act of God, the fault of the shipper, the inherent vice of the goods, or the acts of public enemies. *Wirth Ltd. v. S/S Acadia Forest,* 537 F.2d 1272, 1276 (5th Cir.1976) (citing Gilmore & Black, *supra,* at 140); *see also* Sturley, *supra,* at 4 (citing *The Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 23, 16 L.Ed. 41 (1858)).

In response to this system, carriers began to contract around the common law rules under which they had such broad liability. These liability-limiting provisions, while generally accepted in England and other European countries, were not readily embraced in the United States. Thus, American courts permitted carriers to limit their liability in some instances, but did not allow carriers to contract around their own negligence or their failure to provide a seaworthy ship. *Wirth Ltd.,* 537 F.2d at 1276-77; Gilmore & Black, *supra,* at 142; Sturley, *supra,* at 5-6.

The disparity between domestic and foreign law regarding the permissible allocation of risks placed American ship owners at a competitive disadvantage and left American shippers of goods to the mercy of the foreign shippers and their contracts. To remedy this situation, Congress passed the Harter Act, 46 U.S.C.App. §§ 190-96. The Harter Act sought to balance the interests of ship owners, who wished to contractually avoid liability for negligent damage to cargo, and shippers, who wished to hold ship owners fully responsible for negligent damage to cargo. *Wirth Ltd.,* 537 F.2d at 1277; Gilmore & Black, *supra,* at 143; Sturley, *supra,* at 10-14. Thus, under the Harter Act, a carrier still could not avoid

liability for his failure to "exercise due diligence" in furnishing a seaworthy vessel[5] or for his negligent care of cargo.[6] Yet, on the other hand, a carrier who exercised the required due diligence would not be responsible for damage caused by negligence in the navigation or management of the ship.[7]

---

[5]Specifically, the Harter Act provides:

> It shall not be lawful for any vessel transporting merchandise or property from or between the ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence [to] properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened weakened, or avoided.

46 U.S.C.App. § 191.

[6]The Harter Act provides:

> It shall not be lawful for the manager, agent, master or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause or covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage resulting from negligence, fault, or failure in proper loading, stowage custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge.

46 U.S.C.App. § 190.

[7]The Harter Act states:

> If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned,

Although the Harter Act protected the interest of domestic shippers, in most of the rest of the world, shippers remained subject to the stringent exculpatory clauses inserted into bills of lading. *Wirth Ltd.,* 537 F.2d at 1277; Gilmore & Black, *supra,* at 143-44; Sturley, *supra,* at 14. In response to commercial banking and underwriting interests and after years of international wrangling, the Harter Act's compromise was adapted for international use in the Hague Rules, which were promulgated at the Brussels Convention of August 25, 1924. *Wirth Ltd.,* 537 F.2d at 1278; Sturley, *supra,* at 18-32. Twelve years later, COGSA was adopted by the United States as the nation's statutory codification of the Hague Rules.

COGSA vests shipowners with certain defenses in cargo cases. For example, like the Harter Act, COGSA absolves carriers and shipowners for liability for cargo damaged by an unseaworthy vessel, if the owner or carrier exercised due diligence in making the ship seaworthy, 46 U.S.C.App. § 1304(1),[8] and for losses caused

---

equipped, and supplied, neither the vessel, her owner or owners, agent, or charters, shall become or be held responsible for damage or loss resulting from faults or errors of navigation ... or be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative....

46 U.S.C.App. § 192.

[8]Section 1304(1) of COGSA states:

Neither the carrier nor the ship shall be liable for

20

by an act of God, fire, act of a public enemy, or other specified causes.  46 U.S.C.App. 1304(2).[9]  COGSA also grants shippers freedom from cargo damage caused "without the act, fault, or neglect of the shipper his agents, or his servants."  46 U.S.C.App. § 1304(3).  Also, similar to the Harter Act, COGSA regulates shippers' ability to further limit their liability by providing that:

> any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability ... shall be null and void and of no effect.

46 U.S.C.App. § 1303(8).  This limiting clause is the codification of the United States' common law rule preventing contractual clauses absolving ship-owners for their negligence;  it in no way

---

> loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and [all] parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation....

46 U.S.C.App. § 1304(1).

[9]COGSA catalogs several "[u]ncontrollable causes of loss" for which "neither the carrier nor the ship shall be responsible" if they cause damage to the cargo.  These items include:  neglect in navigation or management of the ship;  fire (unless caused by the actual fault of the carrier);  act of God;  act of war;  act of public enemies;  arrest or seizure under legal process;  quarantine restrictions;  act or omission of the shipper of goods or his agents;  strikes or lockouts (not including the carriers own actions);  riots or civil commotions;  acts saving or attempting to save property or life at sea;  the inherent vice of the goods;  insufficient packing;  latent defects;  and other causes arising without the actual fault of the carrier (but in these cases the burden of proof is on the carrier to show that it did not contribute to the loss).  46 U.S.C.App. § 1304(2).

abrogates a negligence action for the damage to cargo.

As noted above, when COGSA was enacted, it was well established that in certain situations a claim for cargo damage could sound in tort as well as in contract, and "we assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990). Congress could have eliminated the negligence cause of action for damage to cargo through COGSA, but it did not. *Cf. Miles* 498 U.S. at 29-30, 111 S.Ct. at 323-25 (holding that the Jones Act did not eliminate the well-established maritime cause of action for wrongful death). Thus, while COGSA provides certain parameters under which any claim for cargo must operate, the Act does not abrogate the long-standing rule of admiralty allowing certain cargo claims to sound both in tort and in contract.

In the more than half century that COGSA has existed, no circuit has indicated that, through COGSA, Congress intended to eliminate the tort cause of action for damage to cargo. Nor does the legislative history of COGSA manifest such an intent. *See generally The Legislative History of the Carriage of Goods by Sea Act and the Travaux PÁeparatoires of the Hague Rules* (Michael Sturley ed. & Caroline Boyle trans., 1990) (assembling United States' and international legislative histories). Thus, it is not surprising that BIL brings neither circuit court precedent nor statutory history to the attention of the court. In *Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.,* 896 F.2d 656 (1st Cir.1990)

22

and *Reisman v. Medafrica Lines, U.S.A.,* 592 F.Supp. 50 (S.D.N.Y.1984), the courts, relying on *Miller Export Corp. v. Hellenic Lines, Ltd.,* 534 F.Supp. 707, 710-11 (S.D.N.Y.1982), held that COGSA's one year statute of limitations barred claims of negligence. These cases, however, did not hold that COGSA did not allow negligence claims generally. This fact is underscored by the Second Circuit's recent statements in the *M/V Amolyntos,* noting that "an action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action." 11 F.3d at 367.

In *St. Paul Fire & Marine Insurance Co. v. Marine Transportation Services Sea-Barge Group, Inc.,* 727 F.Supp. 1438, 1439 (S.D.Fla.1989), the court did indicate that COGSA provided the "exclusive remedy, barring all other theories of liability, including theories of negligence." Nevertheless, this case merely holds that COGSA's provisions cannot be circumvented by pleading a claim in tort. Neither *St. Paul Fire and Marine* nor any of the other cases cited by BIL stands for the proposition that in proper circumstances a claim subject to COGSA cannot be a tort claim and therefore should not be afforded preferred maritime lien status. As one commentator noted:

> since the law is clear that cargo claims can be pleaded so as to sound in tort, it is difficult to see any logical reason why such claims should be treated any differently from any other tort claim. This is not to say that the Carriage of Goods by Sea Act and the defenses it provides should be ignored in lien cases. The carrier may, and in appropriate cases undoubtedly will, plead defenses provided by COGSA and its bill of lading. However, if cargo has pleaded and proved a claim sounding in tort and the defenses do not prevail, the claim should be given preferred maritime status.

23

Norman B. Richards, *Maritime Liens in Tort, General Average, and Salvage,* 47 Tul.L.Rev. 569, 581-82 (1973) (footnotes omitted). COGSA governs certain aspects of claims for damage to cargo and provides carriers with certain defenses. It does not, however, preclude claims in tort for negligent damage to cargo. In the instant case, there is no dispute that Associated Metals' cargo was damaged not only by the breach of contract of carriage by the vessel but also by the physical and financial unseaworthiness of the vessel and the negligence of her owners and/or operators. COGSA does not convert this hybrid action into a mere contract claim.

Simply, we do not denigrate the importance, application, or defenses of COGSA's. We only hold that COGSA does not preclude claims for cargo damages that sound in tort.

4. Ship Mortgage Act

BIL also contends that recognizing Associated Metals' claim as a tort claim and thereby granting it preferred status would defeat the purpose of the Ship Mortgage Act. We disagree. The Fourth Circuit's treatment of this issue is insightful. In *Oriente Commercial,* the district court acknowledged that because of the broad duties of a vessel as common carrier, claims for damage to cargo could almost always be brought in tort. *Oriente Commercial,* 529 F.2d at 222. Nevertheless, the district court reasoned that allowing these hybrid tort and contract claims to sound in tort would contravene the purposes of the Ship Mortgage Act by giving cargo claims priority over preferred mortgage liens and would make

24

cargo claims superior to supply and repair liens "which are most in need of priority." *Id.* The Fourth Circuit squarely rejected these arguments, stating:

> that the [Ship Mortgage Act] draws no distinction between cargo claims that sound in tort, the so-called hybrid liens, and any other type of claim of damages arising out of tort. While Congress might have been well advised to subordinate cargo claims, it flatly granted priority to all claims arising out of tort.... Whatever Congress meant, it stated that all tort liens are prior to preferred mortgage liens.

*Id.* at 223; *accord All Alaskan Seafoods,* 882 F.2d at 429.

We agree with the reasoning of the Fourth Circuit. As noted above, it has long been established that certain claims for damage to cargo may sound in either tort or contract. Further, had it wished, Congress could have prioritized tort liens resulting from damaged cargo differently than other tort liens; it did not. The Ship Mortgage Act plainly states that *all* tort liens are preferred maritime liens, and we will not depart from Congress's plain words by granting tort liens for damaged cargo a different status than other tort liens.

C. Custodia Legis

Finally, BIL argues that the district court erred in its finding that the costs associated with unloading the steel constituted *custodia legis* expenses. We disagree and find that the district court did not abuse its discretion in recognizing Associated Metals' costs as *custodia legis.*

Generally, "services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court or of an officer of the court ... should be allowed as

25

*custodia legis* expenses." *General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 816 (5th Cir.1982) (citing *New York Dock Co. v. The Poznan,* 274 U.S. 117, 121, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927)). Even if such expenditures are made absent a court order, " "*custodia legis* ' expenses may be ordered by the court ... if equity and good conscience so require." *Id.* at 815; *accord Morgan Guar. Trust v. Hellenic Lines Ltd.,* 593 F.Supp. 1004, 1010 (S.D.N.Y.1984).

In the instant case, the district court determined that "Associated's discharge of its cargo was beneficial to all creditors and it was directly related to the substantial sale price of the vessel." The *Alexander's Unity* contained several thousand pieces of steel, several hundreds of miles away from their destination; it seems more than reasonable that the removal of the steel was necessary to maintain the value of the vessel. *See Turner & Blanchard, Inc. v. The S.S. Emilia,* 322 F.2d 249, 250 (2d Cir.1963) (holding that " "service rendered to the ship, in the aid of cargo, necessarily inured to their [lienors] benefit' " and were properly considered *custodia legis* expenses (alteration in original)); *Morgan Guar. Trust,* 593 F.Supp. 1004, 1010 (S.D.N.Y.1984) (finding that cargo discharge costs necessary to minimize the possibility of additional claims against the vessel and to maximize the sales price of the vessel were *custodia legis* expenses).

BIL attempts to argue that the award of *custodia legis* expenses was improper because part of the benefit of the discharge

26

inured to Associated Metals. We find this argument wanting. Anything that maintained the value of the ship benefited all of the lienholders of the ship, including Associated Metals. The fact that Associated Metals made the expenditure and benefited from the discharge does not prohibit the finding that the expense was necessary to maintain the value of the ship. We are also unpersuaded by BIL's contention that the discharge expenses were not necessary to maintain the value of the ship because no attempt was made to sell the ship with the cargo aboard it. The district court is not required to attempt to sell the ship and fail or to receive insufficient offers before concluding that an expenditure will maintain the value of the vessel. Thus, we find no clear error in the district court's determination that the expenses of unloading the ship were necessary to maintain the *Alexander's Unity*'s value. Consequently, we conclude that the district court did not abuse its discretion in finding that the discharge expenses were *custodia legis.*

## IV. CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.